Argued and submitted April 13, reversed in part and remanded June 22, 2011

## GUNDERSON, LLC,
*Petitioner,*

*v.*

## CITY OF PORTLAND,
*Respondent,*

*and*

## FRIENDS OF CATHEDRAL PARK
## NEIGHBORHOOD ASSOCIATION, et al.,
*Respondents below.*

Land Use Board of Appeals
2010039

## WORKING WATERFRONT COALITION,
*Petitioner,*

*v.*

## CITY OF PORTLAND,
*Respondent,*

*and*

## FRIENDS OF CATHEDRAL PARK
## NEIGHBORHOOD ASSOCIATION, et al.,
*Respondents below.*
Land Use Board of Appeals
2010040

## SCHNITZER STEEL INDUSTRIES, INC.,
*Petitioner,*

*v.*

## CITY OF PORTLAND,
*Respondent,*

*and*

## FRIENDS OF CATHEDRAL PARK
## NEIGHBORHOOD ASSOCIATION, et al.,
*Respondents below.*

# Land Use Board of Appeals
## 2010041

## A147803

259 P3d 1007

Robyn Ridler Aoyagi argued the cause for petitioner Gunderson, LLC. With her on the brief were Steven D. Olson, Joseph S. Voboril, and Tonkon Torp LLP.

Roger A. Alfred argued the cause for petitioner Schnitzer Steel Industries, Inc. With him on the brief were Steven L. Pfeiffer and Perkins Coie LLP.

Phillip E. Grillo and Miller Nash LLP filed the brief for petitioner Working Waterfront Coalition.

Linly F. Rees, Deputy City Attorney, argued the cause for respondent. With her on the brief was Kathryn S. Beaumont, Chief Deputy City Attorney.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

In 2004, the City of Portland resolved to update its Greenway Plan for the land along the Willamette River. As part of that process, the city divided the river into three sections: the North Reach, the Central Reach, and the South Reach. The North Reach, a 12-mile stretch between the Broadway Bridge and the confluence with the Columbia River, was the first phase of the update, and in April 2010, the city adopted Ordinance No. 183694, the River Plan for North Reach. The ordinance added new chapters to the city zoning code, amended existing chapters of the zoning code and other city code provisions, amended the city's comprehensive plan, and modified the Greenway boundary.

Petitioners—Gunderson, LLC (Gunderson), Schnitzer Steel Industries, Inc. (Schnitzer), and Working Waterfront Coalition (WWC)—represent the industrial interests of the North Reach. Petitioners appealed the city's decision to the Land Use Board of Appeals, challenging the ordinance on multiple grounds. LUBA agreed with petitioners in some respects, disagreed in others, and remanded to the city for further proceedings. Petitioners now seek review of LUBA's decision. We conclude that LUBA erred with respect to its review of one issue, the Goal 15 inventory; otherwise, we affirm.

By way of background,[1] the Oregon legislature in 1973 declared it to be "in the public interest to develop and maintain a natural, scenic, historical and recreational greenway upon lands along the Willamette River to be known as the Willamette River Greenway." ORS 390.314(1). Statewide Planning Goal 15, which specifically pertains to the Willamette River Greenway, requires that local governments develop and implement a plan for (1) establishing the Greenway boundary, (2) managing uses of lands within the Greenway, and (3) acquiring land to serve the purposes of the Greenway. OAR 660-015-0005; Goal 15, Paragraph A(2) (Greenway Program shall "be composed of cooperative local

---

[1] The relevant facts are largely undisputed. To the extent that the parties disagree about the existence of or significance of certain evidence in the record, we will address those disagreements in the context of particular assignments of error.

and state government plans for the protection, conservation, enhancement and maintenance of the Greenway * * *.").

The City of Portland adopted its Greenway Plan in 1987 as part of its zoning code, and the Greenway Plan has since governed zoning for land surrounding the Willamette River within the city. In 2004, the city set course on a three-phrase "River Plan" intended to update and replace parts of the 1987 Greenway Plan. The first phase of the River Plan involved the segment of the waterfront north of the Broadway Bridge.[2] That segment, described as the North Reach, is Portland's working harbor. It includes nearly one-third of the city's industrial land base and is a freight transportation hub.

The decision at issue in this case, Ordinance No. 183694, adopted the North Reach River Plan, or "NRRP." The NRRP has three major components for purposes of the issues before us. First, the NRRP creates a new "River Environmental" zoning overlay that applies on top of the city's existing base zones and "River" overlays.[3] Property within the new River Environmental overlay zone (referred to as the "RE-overlay") is subject to corresponding "River Review" standards and procedures. River Review requires applicants seeking approval for certain development to mitigate unavoidable natural resource losses. The applicant can accomplish that mitigation by planting new vegetation elsewhere on the site; or, if on-site mitigation is not feasible, the city may allow certain off-site mitigation, including mitigation at a city "River Restoration Site," purchase of "mitigation credits" from a certified mitigation bank, or payment of a mitigation fee.

The second major component of the NRRP is the imposition of vegetation enhancement standards on all "River" overlay property in the North Reach, regardless of whether the land carries the additional RE-overlay. The vegetation enhancement standards require property owners in "River-zoned" sites to plant additional vegetation if "new

---

[2] On the east side of the river, the North Reach actually extends north from the Freemont Bridge.

[3] The preexisting "River" overlays included "River Industrial," "River General," and "River Recreational."

development" or "exterior alteration" occurs on the site. To satisfy the standards, the property owner must spend one percent of the project value (up to a maximum expenditure of $200,000) to (1) plant vegetation on the site, (2) build a qualifying eco-roof on-site, or (3) pay the city to plant vegetation on city-owned property in the North Reach. The goal of the standards is to add vegetation to 15 percent of an owner's site acreage, and that percentage is adjusted depending on where the vegetation is planted. For instance, eco-roofs receive half-credit, whereas vegetation in an RE-overlay area receives additional credit. The NRRP also sets requirements as to the vegetation that counts toward the 15 percent; existing vegetation does not.

The third significant component of the NRRP is its modification of the Greenway boundary in the North Reach. In short, the NRRP takes certain land out of the Greenway and adds other land to it.

After the city adopted the NRRP, petitioners appealed that decision to LUBA. They contended, generally, that the plan did not adequately protect the industrial interests of the harbor. More specifically, petitioners advanced separate but overlapping assignments of error to the effect that the NRRP failed to comply with Statewide Planning Goals, including Goal 2 ("Land Use Planning"), Goal 9 ("Economy of the State"), Goal 12 ("Transportation"), and Goal 15 ("Willamette River Greenway"). Petitioners further argued that the NRRP was inconsistent with the Portland Comprehensive Plan (PCP).

LUBA agreed with certain of petitioners' contentions and remanded the decision to the city. Most notably, LUBA agreed with petitioners' arguments that the city had not adequately considered the effects of the NRRP—specifically, the RE-overlay, mitigation requirements of River Review, and the vegetation enhancement standards—on the city's land inventory for purposes of Goal 9. That goal requires the city to maintain an adequate supply of industrial land. In order to demonstrate compliance with Goal 9, LUBA explained,

"the city must necessarily (1) undertake to quantify to the extent necessary the number of acres the new regulations

will likely remove from potential industrial development, compared to the existing acknowledged regulations, and (2) evaluate the impact of any net reduction in land supply on the city's Goal 9 inventory of industrial lands. The second step will entail making at least some determinations regarding the adequacy of the city's industrial land supply, before and after application of the new regulations."

LUBA therefore remanded the decision to the city for further proceedings in that regard.[4]

On other matters, however, LUBA rejected petitioners' arguments on the merits or declined to reach them. With respect to the latter issues, LUBA concluded that petitioners' assignments of error were either moot in light of the remand or were beyond LUBA's scope of review because they involved challenges to Greenway boundary amendments. Petitioners now seek judicial review as to some of the issues that LUBA either resolved against them or did not resolve at all. Because of their overlapping nature, we group the assignments in terms of subject matter, beginning with the challenges involving Goal 15.

## I. GOAL 15 ISSUES

Goal 15 requires state and local governments to "protect, conserve, enhance and maintain the natural, scenic, historical, agricultural, economic and recreational qualities of lands along the Willamette River," consistent with lawful uses present on December 6, 1975. The goal provides that any "[i]ntensification of uses, changes in use[,] or developments" be consistent with "the Willamette Greenway Statute, this goal, the interim goals in ORS 215.515(1) and the statewide planning goals[.]"

As previously noted, Goal 15 contemplates a "Willamette Greenway Program" that is

---

[4] Portland Comprehensive Plan Goal 5 similarly required the city to maintain an adequate supply of industrial land. The city had concluded that the NRRP was consistent with PCP Goal 5 for the same reasons that it was in compliance with Goal 9. LUBA remanded on that issue as well, concluding that the city's "reliance on its conclusions under Goal 9 that the NRRP would not affect the city's industrial land supply is not sufficient to explain why the NRRP is consistent with PCP Goal 5."

"composed of cooperative local and state government plans for the protection, conservation, enhancement and maintenance of the Greenway, and of implementation measures including management through ordinances, rules, regulations, permits, grants as well as acquisition and development of property, etc. It shall also become a part of all other local and state plans and programs within and near the Greenway."

Goal 15, Paragraph A(2). The Greenway Program "shall include":

"a.   Boundaries within which special Greenway considerations shall be taken into account;

"b.   Management of uses on lands within and near the Greenway to maintain the qualities of the Greenway;

"c.   Acquisition of lands or interests in lands from a donor or willing seller or as otherwise provided by law in areas where the public's need can be met by public ownership."

Goal 15, Paragraph A(3).

Paragraph B of Goal 15, "Inventories and Data," describes the information and data that must be collected for purposes of implementing those three components (boundaries, management, and acquisition) of the Greenway Program:

"Information and data shall be collected to determine the nature and extent of the resources, uses and rights associated directly with the Willamette River Greenway. These inventories are for the purpose of determining which lands are suitable or necessary for inclusion within the Willamette River Greenway Boundaries and to develop the plans and management and acquisition programs."

The paragraph then lists items that "shall be inventoried as it relates to the Greenway objectives," including "[l]and currently committed to industrial, commercial and residential uses[.]"

Goal 15 also lists, in Paragraph C ("Considerations and Requirements"), certain factors on which each city must base its comprehensive plan within the Greenway. Those factors include various "use management considerations and

requirements," such as "development away from river."[5] That particular factor directs development away from the river to the greatest degree possible, "provided, however, [that] lands committed to urban uses within the Greenway shall be permitted to continue as urban uses," including port and industrial uses. Goal 15, Paragraph K, then provides definitions for "lands committed to urban use," as well as two other key terms in Goal 15—"change of use" and "intensification."

On judicial review, petitioners raise numerous assignments of error that touch on Goal 15, including assignments concerning (1) the adequacy of the city's Paragraph B inventory; (2) whether parts of the NRRP are consistent with the Paragraph K definitions of "change of use," "intensification," and "lands committed to urban use"; and (3) whether the NRRP lawfully amends the Greenway boundaries. We address each of those subject areas in turn.

A. *Paragraph B inventory review*[6]

Schnitzer and WWC separately argued to LUBA that the city failed to complete the inventory required under Paragraph B of Goal 15, which, as set out above, is for the purpose of "determining which lands are suitable or necessary for inclusion within the Willamette River Greenway Boundaries and to develop the plans and management and acquisition programs." In its opinion, LUBA treated those assignments of error as "challenges to the Greenway boundary amendment's compliance with Goal 15." LUBA explained:

"1. Inventory

"Goal 15, Paragraph B requires the city to inventory certain features of land to determine which properties to include within the Greenway boundary. The NRI [Willamette River Natural Resources Inventory] that was adopted as part of the NRRP includes the city's inventory. Based on that inventory, the NRRP amended the city's

---

[5] Other factors include agricultural lands, recreation, access, fish and wildlife habitat, scenic qualities and views, protection and safety, vegetative fringe, timber resource, aggregate extraction, and greenway setback. Only the "development away from river" factor is relevant to the issues before us.

[6] Schnitzer's First Assignment of Error; Gunderson's Third Assignment of Error; WWC's First Assignment of Error.

zoning map to amend the location of the Greenway boundary. The amendments to the Greenway boundary include Schnitzer's property, which had previously not been included within the boundary.

"WWC and Schnitzer argue that the inventory that is required by Goal 15, Paragraph B is incomplete. According to Schnitzer, it fails to include inventories of multiple features that are required to be included.

"*The city responds that challenges to the Greenway boundary amendment's compliance with Goal 15 are not within LUBA's scope of review.* ORS 390.322 gives LCDC jurisdiction to approve greenway boundary amendments, and OAR 660-020-0065(6) provides that such amendments are to be approved by rule making. According to the city, because ORS 197.825(2)(d) provides that LUBA does not have jurisdiction to review administrative agency decisions that result in rule making, LUBA may not review challenges to the portion of the NRRP that amends the Greenway boundary, including Schnitzer's challenge to the adequacy of the inventory required by Goal 15, Paragraph B.

"*We agree with the city. Challenges to the city's amendment of the Greenway boundary are not within LUBA's scope of review. Accordingly, we do not address WWC's Fifth Assignment of Error*[7] *and that portion of Schnitzer's Second Assignment of Error that challenges the Greenway boundary amendment.*"

(Boldface in original; footnotes omitted; emphasis added.)

On judicial review, petitioners now challenge LUBA's treatment of their assignments of error regarding the Paragraph B inventory.[8] Their argument is two-fold. First, they contend that LUBA mischaracterized their assignments with respect to the inventory. The inventory requirement, they argue, is not strictly a boundary amendment issue, nor were their assignments of error so limited before LUBA. Second, they argue that, in any event, the

---

[7] The reference to WWC's Fifth Assignment of Error appears to be a mistake. That assignment of error did not address the Greenway Boundary or the inventory requirement.

[8] Petitioner Gunderson joined in Schnitzer's and WWC's arguments below and does so again on judicial review.

NRRP is plainly a land use decision within the scope of LUBA's jurisdiction.

The city, for its part, argues that "LUBA correctly understood Petitioners' Goal 15 * * * inventory arguments to target the River Plan's proposed change to the City's greenway boundaries and appropriately declined to address these arguments." The city then offers a fallback argument: "Even if LUBA misunderstood Petitioners' claims," the Goal 15 inventory requirement does not "require[ ] the City to reinventory lands and uses within its existing greenway boundary for purposes of adopting the River Plan."

Initially, we agree with LUBA's premise that, to the extent petitioners' assignments of error can be said to challenge the proposed Greenway boundary changes in the NRRP, those issues are not "within LUBA's scope of review." The boundaries of the Willamette River Greenway in the city are part of the broader plan for the Willamette River Greenway. *See* ORS 390.318(2)(a). By statute, local governments may revise the plan for the Willamette River Greenway "with the approval of the commission"—that is, the Land Conservation and Development Commission (LCDC). *See* ORS 390.322(3). Thus, in order to accomplish any boundary change proposed in its River Plan, the city must first obtain LCDC's approval.

LCDC, in turn, has promulgated rules establishing a procedure by which local governments can amend segments of the Willamette River Greenway Plan. OAR 660-020-0065. That procedure, like the statutory scheme, contemplates that no amendment to the plan by a local government will be effective unless and until LCDC has first adopted the plan amendment. OAR 660-020-0065(7). In other words, the actual decision on an amendment to the Willamette Greenway boundary is made by LCDC and is not within LUBA's scope of review in this posture. *See* ORS 197.825(2)(d) (LUBA jurisdiction does not include "those land use decisions of a state agency over which the Court of Appeals has jurisdiction for initial judicial review under ORS 183.400, 183.482 or other statutory provisions").

The question, then, is whether LUBA correctly characterized petitioners' assignments of error as challenges to

the proposed boundary amendments in the NRRP. According to the city, petitioners' assignments of error raised the Paragraph B inventory issue "in only the most generalized way at LUBA"; therefore, the city argues, LUBA was justified in treating the arguments exclusively as challenges to the boundary amendments rather than pertaining to any regulatory changes within the *existing* Greenway boundary. We are not persuaded by the city's contention or by LUBA's characterization of the issues before it.

Within its second assignment of error to LUBA, Schnitzer developed a subargument that "[t]he City failed to adequately inventory lands when amending the Greenway boundary." Schnitzer then identified several items for which the city had "failed to include inventories," including "land currently committed to industrial, commercial and residential uses." Schnitzer explained:

> "*Without these required inventories, the city cannot properly determine which lands are suitable or necessary for inclusion within the Greenway boundary.* This determination is especially important to industrial property owners, such as petitioners, because the regulations imposed on lands within the Greenway will have significant impacts on the ability of those property owners to use their industrial properties for industrial purposes. However, the only justification offered by the city for adding some of these new properties to the Greenway boundary appears to be simply a matter of convenience for the city—that is, to avoid split-zoned parcels. This justification is hardly compelling and underscores the need for the required inventories in determining which lands to add to the Greenway boundary. *In addition, as discussed more fully below, the city cannot properly determine if the Goal 15 protections required for all lands committed to urban uses within the Greenway have been met if no inventory of such lands has been completed.*"

(Emphasis added.) In the following section of that second assignment of error, Schnitzer contended that "[t]he city failed to protect all lands committed to urban uses within the Greenway." Schnitzer argued, "As discussed above, the city failed to conduct the required inventory of 'Lands Committed to Urban Use.' Without an inventory, it is unable to demonstrate that such lands will be permitted to continue as urban uses."

WWC, meanwhile, addressed the issue in its fourth assignment of error to LUBA, a dense assignment that conflated inventory issues under Goal 9, Goal 15, and Goal 2. The second to last sentence of that assignment stated, "[The NRRP] also does not inventory land currently committed to industrial, commercial, and residential uses ('lands committed to urban use') in the Greenway, as required by Goal 15." In the argument that followed the assignment, WWC stated:

"Likewise, Goal 15 requires the city to prepare an inventory of all 'land currently committed to industrial, commercial and residential uses,' and 'the ownership of [that] property, including riparian rights.' (See Goal 15, paragraph B.) The information derived from these inventories is in turn used to determine which lands are protected as 'lands committed to urban uses' under Goal 15, paragraph C, as explained more fully below. Also, because (i) overlay-zoned sites located within the Greenway are 'sites zoned for specific industrial and commercial uses' for purposes of Goal 9, paragraph 4 (as explained above), and because Goal 15 protects 'water related and water-dependent uses' from Goal 15's Greenway Setback requirements (as explained below), it is necessary for the city to inventory these lands and uses as well, in order to comply with Goals 9 and 15.

"* * * * *

"The city's findings are also inadequate with regard to the required Goal 15 inventory. The city's findings make no mention of any attempt by the city to inventory 'land committed to urban uses' for purposes of Goal 15. As explained more fully below, the city's failure to properly inventory these lands under Goal 15 has led to other substantive violations of Goal 15 with regard to improper regulation of 'land committed to urban use' and 'water-related and water-dependent uses.' For all of the above reasons, the city has failed to meet its inventory requirements in River Plan. In doing so, its decision violates Goals 2, 9, and 15."

(Record citations omitted; underscoring in original.)

The city's response brief to LUBA took a narrow view of the assignments of error involving the Goal 15 inventory, treating them exclusively as challenges to the proposed changes to the Greenway boundaries in the NRRP. The city,

grouping various assignments of error topically, described petitioners' contentions this way:

> "Petitioners assert the Council's approval of the green-way boundary amendment violates Goal 15 for several reasons: (1) LCDC hasn't approved it; and (2) the change lacks an adequate factual base, including an inventory of the items listed in Goal 15. None of these arguments have merit. * * * If the inventory requirement is applicable to the minor boundary change included in the River Plan, the findings describe the evidence that identifies [the items listed in] Goal 15, Paragraph B. * * *

> "Most important, however, is that LCDC makes the final determination of whether the City's greenway boundary amendment complies with Goal 15 and the Greenway statutes. * * * Because ORS 390.322 gives LCDC jurisdiction over greenway boundary amendments, LUBA may not address issues of evidentiary support or procedural error regarding compliance with greenway boundary amendment statutes and administrative rules."

LUBA accepted that characterization of petitioners' assignments and ruled, as set out above, that challenges to Greenway boundary amendments were beyond its scope of review.[9]

In our view, the city's characterization of petitioners' arguments was too narrow, and LUBA erred in accepting that characterization. To be sure, petitioners focused much of their attention on the importance of an adequate inventory for purposes of determining the Greenway boundaries; indeed, Schnitzer, in a subheading to its assignment, referred to the city's failure to conduct an inventory "when amending the Greenway boundary." But petitioners did not limit their inventory arguments to the proposed boundary changes. Rather, petitioners expressly argued that an inventory was necessary to determine Goal 15 compliance *within* the Greenway boundaries, particularly as to urban lands within those boundaries. As set out above, Schnitzer specifically argued that, without the Goal 15 inventory, "the city

---

[9] As previously noted, 243 Or App at 620 n 7, LUBA purported to address WWC's Fifth Assignment of Error in this part of its decision. The Goal 15 inventory issue raised in WWC's Fourth Assignment of Error was never addressed expressly in LUBA's opinion.

cannot properly determine if the Goal 15 protections required for all lands committed to urban uses *within the Greenway* have been met" (emphasis added); WWC likewise argued that the city's failure to prepare a Goal 15 inventory for lands committed to urban use "in the Greenway" "has led to other substantive violations of Goal 15 with regard to improper regulation of 'land committed to urban use' and 'water-related and water-dependent uses.' " Moreover, even assuming that Schnitzer's second assignment of error to LUBA was too narrowly drawn, WWC's fourth assignment of error to LUBA was not. That assignment, in which the other petitioners joined, sufficiently presented to LUBA a question about the adequacy of the city's inventory apart from any challenge to the proposed boundary amendments in the NRRP. LUBA erred in failing to consider that issue, and we therefore remand so that LUBA can do so in the first instance.[10] *See* ORS 197.835(11)(a) (where possible, LUBA "shall decide all issues presented to it when reversing or remanding" a land use or limited land use decision); ORS 197.850(9)(a) (allowing reversal or remand of a LUBA order if the court finds the order "to be unlawful in substance").

B.   *Application of Goal 15 regarding existing urban uses*[11]

Petitioners' second cluster of challenges to LUBA's decision concerns the extent to which Goal 15 protects

_____

[10] The city "agrees that LUBA did not expressly address Petitioners' argument that Goal 15, Paragraph B requires the City to conduct new inventories to justify the River Plan's regulatory changes within the existing Greenway boundary." Nonetheless, the city argues that a "careful parsing" of Goal 15 and its context demonstrates that the city was not actually required to reinventory lands and uses for purposes of amending regulations within existing Greenway boundaries. *See* Goal 15, Paragraph B ("These inventories are for the purpose of determining which lands are suitable or necessary for inclusion within the Willamette River Greenway Boundaries *and to develop the plans and management and acquisition programs*." (Emphasis added.)). We do not understand LUBA to have considered that question, expressly or implicitly; it is an issue that, in the city's words, requires a "careful parsing" of Goal 15, and it is not an issue that we would expect LUBA to decide silently. Because LUBA has not yet addressed the merits of the city's argument that Goal 15 does not contemplate a new inventory for regulatory changes within the existing Greenway, we will not do so on judicial review. Based on our holding, we also do not address WWC's ancillary argument that such an inventory is required under Goal 2, which, in part, addresses the need for adequate factual bases for a city's land use plans.

[11] Schnitzer's Second Assignment of Error; WWC's Second Assignment of Error.

existing urban uses within the Greenway. Petitioners argued to LUBA that Goal 15 protects "lands committed to urban uses" within the Greenway unless changes to such development constitute "changes of use" or "intensifications of use." According to petitioners, certain aspects of the NRRP—the River Review process and the vegetation enhancement standards, among them—regulate urban development even if it does not rise to the level of a "change of use" or "intensification of use," thereby violating the goal of protecting "land committed to urban use."

LUBA rejected petitioners' arguments and found that the city's regulation of urban uses in the NRRP was consistent with Goal 15:

> "We agree with the city that Goal 15, Paragraph (C)(3)(j) simply cannot be read as broadly as petitioners urge to exempt expansions or intensifications of all existing urban uses from development review, especially given that Goal 15 requires the city to review certain developments. We also agree with the city that the development that it has categorically exempted from River Review and/or made subject to a stream-lined review process * * * is consistent with Goal 15, Paragraph K's description of actions that are not a 'change of use' or 'intensification.' "

For the reasons that follow, we agree with LUBA's understanding of Goal 15.

Goal 15, once again, is intended to protect, conserve, enhance, and maintain the qualities of the Willamette River Greenway in a manner "consistent with the lawful uses present on December 6, 1975." Goal 15, Paragraph A(1). "Intensification of use, changes in use or development" after that date must be consistent with, among other things, the provisions of Goal 15.[12] *Id.* To that end, local governments are

---

[12] The goal itself defines "change of use" and "intensification":

"**Change of Use** means making a different use of the land or water than that which existed on December 6, 1975. It includes a change which requires construction, alterations of the land, water or other areas outside of existing buildings or structures and which substantially alters or affects the land or water. It does not include a change of use of a building or other structure which does not substantially alter or affect the land or water upon which it is situated. Change of use shall not include the completion of a structure for which a valid permit had been issued as of December 6, 1975 and under which permit

required to establish "provisions by ordinance for the review of intensifications, changes of use or developments to insure their compatibility with the Willamette River Greenway." Goal 15, Paragraph F(3).

Meanwhile, Paragraph C(3) of Goal 15 sets forth "use management considerations and requirements." Among those considerations and requirements is "[d]evelopment away from [the] river":

> "Developments shall be directed away from the river to the greatest possible degree; *provided, however, lands committed to urban uses within the Greenway shall be permitted to continue as urban uses,* including port, industrial, commercial and residential uses, uses pertaining to navigational requirements, water and land access needs and related facilities[.]"

Goal 15, Paragraph C(3)(j) (emphasis added). "Lands committed to urban uses," in turn, are defined as "those lands upon which the economic, developmental and locational factors have, when considered together, made the use of the property for other than urban purposes inappropriate." Goal 15, Paragraph K(2).

In this case, petitioners contend that the compatibility review provisions in the NRRP (particularly, the River Review process within the RE-overlay and the vegetation enhancement standards) are too restrictive of development

---

substantial construction has been undertaken by July 1, 1976. The sale of property is not in itself considered to be a change of use. An existing open storage area shall be considered the same as a building.

"Landscaping, construction of driveways, modifications of existing structures, or the construction or placement of such subsidiary structures or facilities as are usual and necessary to use and enjoyment of existing improvements shall not be considered a change of use for the purposes of this Goal.

"* * * * *

"**Intensification** means any additions which increase or expand the area or amount of an existing use, or the level of activity. Remodeling of the exterior of a structure not excluded below is an intensification when it will substantially alter the appearance of the structure. Intensification shall not include completion of a structure for which a valid permit was issued as of December 6, 1975 and under which permit substantial construction has been undertaken by July 1, 1976. Maintenance and repair usual and necessary for the continuance of an existing use is not an intensification of use. * * *"

Goal 15, Paragraph K (boldface in original; numbering omitted).

on industrial lands and are therefore inconsistent with Goal 15. Petitioners' arguments, as we understand them, are premised on the theory that Goal 15 "protects existing development and improvements on 'lands committed to urban uses,' unless changes to such development constitute a 'change of use' or 'intensification.' " In other words, petitioners argue that "intensifications" and "changes in use" are the *only* types of industrial development that are subject to regulation. Petitioners contend that the overall structure of Goal 15, including the paragraphs mentioned above, supports their position, with particular emphasis on Paragraph C(3)(j).

According to the city, petitioners' reading of Goal 15 turns the goal on its head. In the city's view, "there is nothing in Goal 15 prohibiting cities from adopting regulations or discretionary land use review processes or dictating that all development within the greenway is immune from development review." Rather, "Paragraph C(3)(j) allows urban land uses to continue and prevents the City from regulating these committed lands in a way that entirely precludes continued urban use." In short, the city responds, "Goal 15 is neither as protective of industrial uses, nor is the challenged code as restrictive, as Petitioners contend."

We agree that petitioners overstate the protection that Goal 15 provides to lands committed to urban use within the Greenway. First, Goal 15 imposes restrictions on "intensification of uses, changes in use or development" and requires local governments to ensure that intensifications, changes in use, and development are consistent with Goal 15. Those restrictions do not address, either expressly or implicitly, the obverse situation—the regulation of activity that is *not* intensification, change in use, or development.

Nonetheless, petitioners suggest that Goal 15 reflects a political compromise that would protect urban uses within the Greenway from more restrictive local regulation. The primacy and protection of urban uses that petitioners suggest is undercut by the legislature's declaration of its findings and purpose in the creation of the Greenway in ORS 390.314, which states, in part:

"(1)   The Legislative Assembly finds that, to protect and preserve the natural, scenic and recreational qualities of lands along the Willamette River, to preserve and restore historical sites, structures, facilities and objects on lands along the Willamette River for public education and enjoyment and to further the state policy established under ORS 390.010, it is in the public interest to develop and maintain a natural, scenic, historical and recreational greenway upon lands along the Willamette River to be known as the Willamette River Greenway.

"(2)   In providing for the development and maintenance of the Willamette River Greenway, the Legislative Assembly:

"* * * * *

"(b)   Recognizing the need of the people of this state for existing residential, commercial and agricultural use of lands along the Willamette River, *finds it necessary to permit the continuation of existing uses of lands that are included within such greenway; but, for the benefit of the people of this state, also to limit the intensification and change in the use of such lands so that such uses shall remain, to the greatest possible degree, compatible with the preservation of the natural, scenic, historical and recreational qualities of such lands.*"

(Emphasis added.) Thus, the legislature's purpose in establishing the Greenway that is the subject of Goal 15 is to preserve the natural, scenic, and recreational qualities of land and historical sites, rather than to preserve industrial and other urban uses of land, along the Willamette River. ORS 390.314(1). The recital in ORS 390.314(2)(b), which Schnitzer relies on, makes clear that the Greenway program should "permit" existing uses but limit "intensification" and "change of use" within the Greenway. That recital, though, does not demonstrate the legislature's intent to preclude all local regulation of existing urban uses within the Greenway unless specifically required in Goal 15 for an intensification or change in use.

Petitioners' reading of Goal 15 also conflicts with the legislative findings in ORS 197.005, where the legislature described, among other things, the basic framework of

Oregon's land use planning system. In part, that statute provides:

"(3)   Except as otherwise provided in subsection (4) of this section, *cities and counties should remain as the agencies to consider, promote and manage the local aspects of land conservation and development for the best interests of the people within their jurisdictions.*

"(4)   The promotion of coordinated statewide land conservation and development requires the creation of a statewide planning agency to prescribe planning goals and objectives to be applied by state agencies, cities, counties and special districts throughout the state."

ORS 197.005 (emphasis added). In other words, local governance is the rule, and statewide planning goals and objectives are the exception. That structure is further evident in ORS 197.230, which requires LCDC to develop goals that can be applied with a reasonable degree of flexibility by local governments:

"(1)   In preparing, adopting and amending goals and guidelines, the Department of Land Conservation and Development and the Land Conservation and Development Commission shall:

"* * * * *

"(e)   Design goals to allow a reasonable degree of flexibility in the application of goals by state agencies, cities, counties and special districts."[13]

---

[13] In addition, ORS 197.175 provides, in part:

"(1) Cities and counties shall exercise their planning and zoning responsibilities * * * in accordance with ORS chapters 195, 196 and 197 and the goals approved under ORS chapters 195, 196 and 197. * * *

"(2) Pursuant to ORS chapters 195, 196 and 197, each city and county in this state shall:

"(a) Prepare, adopt, amend and revise comprehensive plans in compliance with goals approved by the commission;

"(b) Enact land use regulations to implement their comprehensive plans;

"(c) If its comprehensive plan and land use regulations have not been acknowledged by the commission, make land use decisions and limited land use decisions in compliance with the goals;

"(d) If its comprehensive plan and land use regulations have been acknowledged by the commission, make land use decisions and limited land use decisions in compliance with the acknowledged plan and land use regulations; and

Without more information as to relevant legislative intent, which petitioners do not provide, and in light of the legislative findings in ORS 197.005 and for the other reasons stated above, we will not infer that ORS 390.314(2) and Goal 15 were intended to prohibit the city from regulating development of land committed to urban uses in ways that are consistent with, but different from, the state's mandate to the city to ensure that intensifications or changes of use on such land are compatible with preservation of natural, scenic, historical and recreational qualities of the lands to the greatest extent possible. *See State ex rel Haley v. City of Troutdale*, 281 Or 203, 210, 576 P2d 1238 (1978) (courts should interpret local enactments to function consistently with state laws, if possible, and assume that the legislature does not mean to displace local regulation of local conditions by a statewide law " 'unless that intention is apparent' ") (quoting *LaGrand/Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978); *accord Thunderbird Mobile Club v. City of Wilsonville*, 234 Or App 457, 471, 228 P3d 650, *rev den*, 348 Or 524 (2010) ("[I]t is presumed that the legislature did not mean to impliedly repeal the provisions of a city's civil or administrative law, and courts should seek to reconcile the operation of both state and local laws if possible."). The Supreme Court's decision in *City of Troutdale* is instructive. The city's building code required builders to place sheathing under siding, but the state building code allowed single-wall construction. *Id.* at 205. The statutes authorizing the state building code prohibited local governments from enacting any ordinance "in conflict" with the state's code, *id.* at 208, yet allowed local standards to be set for housing except when the power to do so was "expressly withheld by statute." *Id.* at 210. The head of the agency that promulgated the state's building code sought to enjoin the city from enforcing its own construction standard as in conflict with the state code. *Id.* at 209. The Supreme Court held that, given the legislature's description of the state code as establishing "basic" uniform standards and the administering

---

"(e) Make land use decisions and limited land use decisions subject to an unacknowledged amendment to a comprehensive plan or land use regulation in compliance with those land use goals applicable to the amendment."

agency's description of the state code as providing "minimum" safety standards, it would not conclude that the legislature meant to confine building standards to those expressed in the state code. Because the state had not excluded regulation other than the state's, an injunction against enforcement of the city's building code, a local requirement "compatible with compliance with the state's standards," was improper. *Id.* at 211. Similarly, in this case, we are not persuaded that Goal 15 operates in the way that petitioners contend—that is, to implicitly prohibit local governments from imposing regulations on existing uses in the absence of a "change of use" or "intensification."

Nor does Paragraph C(3)(j) operate as a blanket protection against regulation of urban use that is not an "intensification" or "change of use." Paragraph C(3)(j), "Development away from [the] river," is one of the 11 "considerations and requirements" that local governments must accommodate in plans to implement the Greenway Program. The clause that petitioners isolate—"lands committed to urban uses within the Greenway *shall be permitted to continue as urban uses \* \* \**"—is a restriction on the immediately preceding statement that "[d]evelopments shall be directed away from the river to the greatest possible degree." (Emphasis added.) The protection must be read in that context, and not, as petitioners contend, as an exemption from compatibility review for any urban uses that do not rise to the level of "intensification" or "change of use."

Thus, in order to demonstrate that provisions of the NRRP violate the requirement in Paragraph C(3)(j) that "lands committed to urban uses within the Greenway shall be permitted to continue as urban uses," petitioners must do more than show that the NRRP applies to development other than "intensification" or "change of use." Rather, petitioners must demonstrate that provisions in the NRRP will not permit urban uses, in the language of the goal, "to continue as urban uses." Having reviewed, in that light, petitioners' challenges to the River Review provisions and vegetation enhancement standards of the NRRP, we are not persuaded that the regulations are inconsistent with Goal 15,

Paragraph C(3)(j). LUBA did not err in rejecting those challenges.[14]

## C. *Procedural errors as to the Greenway boundary amendments*[15]

Petitioners' remaining challenges concerning Goal 15 involve the amendments to the Greenway boundaries contemplated by the NRRP. As previously discussed, a local government must obtain LCDC's approval before modifying established Greenway boundaries, 243 Or App at 621, and no ordinance modifying the boundaries shall "have an effective date which is prior to LCDC's adoption of the plan amendment." OAR 660-020-0065(7). In this case, the city adopted the NRRP and set an effective date for the ordinance before LCDC had approved the Greenway boundary amendments. Petitioners therefore asked LUBA to remand the NRRP because it included (1) an unlawful effective date; and (2) boundaries that were inconsistent with the still-operative boundaries previously approved by LCDC.

LUBA, however, concluded that the timing issues were moot because the ordinance was being remanded on other grounds:

"It is unclear to us whether we have authority to reverse or remand the NRRP based upon an alleged violation of OAR 660-020-0065(7). In any case, assuming we do, the issue is effectively moot. * * * [A]s explained above we must remand the NRRP for other reasons. Our remand makes the NRRP ineffective, as a matter of law. It is likely that by the time the city completes the proceedings on remand the issue of compliance with OAR 660-020-0065(7) will no longer be an issue. If it is, then the city will have the opportunity to prevent future violation of the rule, for example, by providing an effective date for the Greenway boundary

---

[14] Petitioners suggest that, "[w]ithout an adequate inventory of land currently committed to urban uses, LUBA and the court cannot determine whether the city has complied with the substantive requirements of Goal 15 to protect, conserve, enhance, and maintain the economic qualities of land within the Greenway." Petitioners do not develop that argument or explain how our resolution of their inventory argument affects our resolution of the issues raised in any of the other assignments; thus, we treat the assignments separately.

[15] Gunderson's Fourth Assignment of Error; WWC's Third Assignment of Error.

amendments that is to occur after LCDC adopts a rule approving the amendments."

On judicial review, petitioners argue that LUBA was required to "decide all issues presented" under ORS 197.835(11)(a) and erred in "speculating" that the city would not make the same mistake on remand. Suffice it to say that ORS 197.835(11)(a) does not require LUBA to decide moot issues. *Mason v. Mountain River Estates, Inc.*, 73 Or App 334, 341, 698 P2d 529, *rev den*, 299 Or 314 (1985) (requirement in ORS 197.835 "that LUBA decide all issues does not mean that LUBA must base its disposition of an appeal on moot issues"). Once LUBA remanded the NRRP, the boundary amendments in the NRRP had no force, and the NRRP would not again be effective until the city adopted a new ordinance with a new effective date. Thus, LUBA was correct that, as a result of its remand, there was no inconsistency between LCDC's established Greenway boundary and the ineffective amendments in the NRRP; nor was the effective date of the ordinance—a date long since past—still a live issue in the case.

## II. GOAL 2 ISSUES[16]

Petitioner Gunderson separately challenges LUBA's decision with regard to the NRRP's compliance with Goal 2, Land Use Planning. Before LUBA, petitioner Gunderson contended that its property should not have been included in the RE-overlay (thereby subjecting it to River Review) because its property included only non-native vegetation and should not have been assigned high and medium resource value. LUBA rejected that argument on the ground that "there is an adequate factual base in the record to support [the city's] designation" of the Gunderson property.

As part of the NRRP, the city adopted a Natural Resources Inventory that characterized properties within the North Reach based on their value as habitat and riparian areas, which the city ranked as high, medium, or low. The city then assigned the RE-overlay to properties with high or medium resource values. Before LUBA, petitioner Gunderson contended that the city's assignment of resource

---

[16] Gunderson's First Assignment of Error.

values and inclusion of properties within the RE-overlay zone—and the Gunderson property in particular—lacked an adequate factual basis as required by Goal 2. Gunderson, whose property includes a high percentage of invasive species, argued that the city should have better explained why non-native vegetation was treated identically to native vegetation for purposes of assigning high or medium resource values. LUBA rejected Gunderson's argument, agreeing with the city that "there is an adequate factual base in the record to support its designation of RE overlay properties and its designation of Gunderson's property within the RE overlay zone."

In its petition for judicial review, Gunderson reprises its argument that there is no evidence in the record to support the city's treatment of invasive species as "natural resources" for purposes of the resources inventory and RE-overlay. According to Gunderson, the portions of the record relied on by the city, and cited by LUBA in its decision, say nothing about the resource value of invasive species; in fact, Gunderson argues, the only evidence in the record is that invasive species are disruptive to the environment and their removal is actually encouraged.

Our role in this circumstance is "to ensure that LUBA has followed the proper 'substantial evidence' standard" in reviewing the city's decision. *Wetherell v. Douglas County*, 209 Or App 1, 4, 146 P3d 343 (2006). Thus, if LUBA properly articulates the "substantial evidence" standard of review, we will affirm unless there is no evidence to support the city's finding or the evidence in the case is " 'so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review[.]' " *Devin Oil Co., Inc. v. Morrow County*, 236 Or App 164, 167, 235 P3d 705 (2010) (quoting *Younger v. City of Portland*, 305 Or 346, 359, 752 P2d 262 (1988)).

Under that standard, LUBA's decision passes muster. LUBA's discussion of the issue and evidence before it, and its legal conclusion, demonstrate that it understood the correct standard of review. LUBA explained:

> "Gunderson maintains that the record is devoid of an explanation about what resource attributes of its property led the

city to include it within the RE overlay zone. According to Gunderson, the city applied the RE overlay to some properties based on the presence of non-native vegetation, which is inconsistent with city and state policies that encourage the removal of non-native and invasive vegetation. Because Gunderson's property includes only non-native vegetation, Gunderson argues the city erred in assigning it high and medium resource values."

LUBA then recounted the city's response:

"The city responds by pointing to evidence in the record that explains that portions of Gunderson's property possess riparian corridor values and were assigned a combined medium and high rank. The city explains that the city's model for preparing the NRI did not distinguish between native and non-native vegetation, because the fact that certain vegetation has been designated for some purposes as invasive does not mean that that vegetation has no value for riparian corridor functions. The city also responds that the NRRP contains both a formal and an informal process for correcting RE overlay zone mapping errors if property owners believe the designation is erroneous."

LUBA agreed that the city's decision was adequately supported by the evidence in the record. Though not referring explicitly to "substantial evidence," LUBA's conclusion embodies exactly that type of a review:

"The city cites to hundreds of pages in the record that support the city's conclusion that the RE overlay properties have resource value as riparian corridors and habitat areas. We agree with the city that there is an adequate factual base in the record to support its designation of RE overlay properties and its designation of Gunderson's property within the RE overlay zone."

Nor is this a case in which "there is no evidence to support the [city's] finding" or where the evidence is "so at odds with LUBA's evaluation" that a reviewing court could infer that LUBA misunderstood or misapplied its scope of review. *Devin Oil Co., Inc.*, 236 Or App at 167. As Gunderson points out, there is ample evidence in the record that invasive species are not considered "natural resources" for many purposes. Nonetheless, the record gives rise to the inference that any vegetation—whether invasive or noninvasive—has

value for purposes of riparian corridor functions, such as providing river bank stabilization. Under the circumstances, we are not persuaded that, for purposes of substantial evidence review, the city was required to further justify its methodology or inclusion of "vegetation" in its inventory calculus. We therefore reject Gunderson's assignment of error.

## III.   GOAL 9 ISSUES[17]

Lastly, Gunderson takes issue with the scope of LUBA's remand. As previously discussed, LUBA remanded the NRRP because the city's findings concerning the effect of the ordinance on the supply of industrial lands were not supported by substantial evidence. According to Gunderson, LUBA erred in failing to explicitly require the city to demonstrate an adequate land supply for the duration of the *planning period* rather than the adequacy of the supply "today." The city responds that "Gunderson challenges a ruling LUBA did not make and asks the Court to issue unnecessary directions to LUBA and the City."

After reviewing LUBA's opinion, we agree with the city's observation that "Gunderson's assignment of error invents an issue where there is none." The NRRP was remanded on evidentiary grounds, because neither the city's 2009 Economic Opportunities Analysis nor its 1989 Economic Opportunities Analysis was sufficient to support the city's conclusion that it would continue to have an adequate supply of industrial land after the NRRP took effect. LUBA was not required to speculate about errors that the city might make on remand. We reject the assignment without further discussion.

## IV.   CONCLUSION

In sum, we agree with petitioners that LUBA erred in not addressing their arguments regarding the adequacy of the city's inventory under Goal 15, and we remand in order for LUBA to address that issue. We otherwise reject petitioners' challenges and affirm the remainder of LUBA's decision.

Reversed in part and remanded.

---

[17] Gunderson's Second Assignment of Error.