ARMSTRONG, P. J.
*250 In this land use case, petitioners seek review of a Land Use Board of Appeals (LUBA) order affirming the City of Portland's decision to grant design review approval and a master plan amendment for a seven-story, mixed-use building proposed by intervenor (we refer to the city and intervenor, collectively, as respondents). On review, petitioners raise three assignments of error, challenging the city's interpretation and application of "better meets" in Portland City Code (PCC) 33.825.040 and of a master plan design guideline to the proposed project. As explained below, because we conclude that LUBA's order was not "unlawful in substance," ORS 197.850(9)(a), we affirm.
We take the relevant facts from LUBA's order, which the parties do not dispute on review:
*1217 "The subject property is the western half of Block 290 (Block 290 West), within the Con-Way Master Plan (CMP) area of the city's Northwest Plan District. The site is zoned Central Employment (EX) with a Design Overlay zone. Development within the CMP is subject to the city's code-based design review standards and guidelines, but also standards and guidelines within the CMP. Under the applicable CMP design standards, building height on Block 290 West is limited to 77 feet, except the southwest corner of Block 290 West, which is limited to 47 feet.
"The CMP encompasses 17.49 acres and includes a number of 200 by 460 square foot blocks that are generally planned under the CMP and Northwest District Plan for redevelopment to mixed uses, including high-density residential uses. The CMP calls for approximately 25 percent of the CMP area to be set aside for public open space. Some of the required public open space is to be provided on Block 290 West, which under the CMP must include a 'publicly accessible, urban square,' which the CMP describes as a 'significant iconic urban place' that is fully accessible by the public and surrounded by active retail space. A significant portion of the remainder of required open space in the CMP area will be provided by a proposed neighborhood park on the eastern half of Block 290 (Block 290 East).
"Block 290 West is bordered on the south by NW Pettygrove Street, and on the west by NW 21st Ave. On the north, Block 290 is bordered by a privately-owned street, *251 NW Quimby Street. Under the CMP, NW Quimby Street is to be improved for open space as a 'festival street,' serving primarily as a pedestrian and bicycle connection. The CMP requires that development on Block 290 West include a 'ground plane connection' between the public square on Block 290 West and the neighborhood park to be developed on Block 290 East.
"Intervenor applied to the city for design review approval and proposed amendments to the CMP, along with five 'modifications,' a type of variance to CMP design standards pursuant to PCC 33.825.040, in order to develop a multi-story residential building with ground floor retail and below grade parking. The approved seven-story building is U-shaped, with an opening facing south to NW Pettygrove Street, and a proposed 16,007-square-foot public square in the middle. The southern tip of the west wing is 'clipped,' shortening the footprint of the west wing by 31 feet and opening up the square to the corner of NW 21st Avenue and NW Pettygrove Street. As discussed below, this clipped corner creates a small area of public open space in the southwest corner of Block 290 West that requires a modification to a CMP standard that requires the public square to have at least 100-foot dimensions on each side. The small portion of the public square is termed 'the panhandle' in the decision and record. In earlier designs, the southern end of the west wing had featured a ground level private space available only to the building's residents. The design ultimately approved by the city moves this private amenity to a roof terrace on top of the west wing.
"The proposed east wing includes a breezeway at ground level to satisfy the requirement for a 'ground plane connection' with the neighborhood park planned for Block 290 East. Intervenor also proposed a CMP map amendment that would allow the building footprint to extend 15 feet into Block 290 East, the western 45 feet of which would be converted to a north-south, 45-foot wide pedestrian accessway connecting Block 290 to development to the north. For vehicular access to the underground parking garage, intervenor proposed access via the northwest corner of Block 290 West and the western portion of the privately owned 'festival street,' NW Quimby Street.
"As noted, the proposed building required five modifications or variances to applicable site-development standards, three of which are at issue in this appeal. The first *252 modification is an increase in the maximum building height from 47 feet to 57 feet in the southwest corner of Block 290 West, to facilitate the private rooftop club house and terrace at the southern end of the west wing. The second modification is to approve the panhandle portion of the public square in the southwest corner of *1218 Block 290 West with dimensions less than 100 feet per side. The third modification is to reduce the height of the breezeway establishing the 'ground floor connection' between Block 290 West and Block 290 East, from 25 feet to a little over 14 feet.[1]
"[1] The other two modifications not directly challenged in this appeal include (1) reducing the depth and amount of retail fronting portions of the public square, and (2) reducing the setback of the upper floors of the east wing.
"Prior to filing its application, intervenor participated in three design advice meetings held by the city's design commission, which involved advisory review of different design concepts for the proposed development. On January 16, 2016, intervenor filed its applications, which initially proposed four smaller buildings on Block 290 West. In March 2017, intervenor modified the design to propose the single U-shaped building with a clipped corner, described above, that was ultimately approved. After holding several public hearings, the design commission approved the proposal.
"Petitioner Northwest District Association (NWDA) appealed the design commission decision to the city council, which held a hearing on October 17, 2017. On November 8, 2017, the city council issued its decision denying the appeal and affirming the design commission decision, with adoption of additional findings."
(Citation omitted.)
The city issued a detailed 46-page decision that walked through each of the applicable community design guidelines and CMP Design Guidelines, both of which apply to the project, and made explanatory findings as to how the project design met each of those guidelines. The city also separately addressed each of the five modifications to the CMP Design Standards and made explanatory findings as *253 to why each requested modification could be allowed under PCC 33.825.040.[1]
Petitioners raised seven assignments of error on review to LUBA, and LUBA affirmed the city's decision. On review to us, petitioners raise three assignments of error to LUBA's order. We address each of those assignments in turn.
In their first assignment of error, petitioners focus, in the abstract, on the meaning of "better meets" in PCC 33.825.040, which allows modifications to design standards if, among other things, "[t]he resulting development will better meet the applicable design guidelines." Petitioners first argue that the city's implicit interpretation of the better-meets standard is insufficient for review and requires a remand to the city for additional explanation. Petitioners next argue that, even if the city's implicit interpretation is sufficient, that interpretation is implausible and not entitled to deference on review.
We first conclude that the city's decision included sufficient explanation to determine how the city was interpreting and applying the better-meets standard in PCC 33.825.040. In its decision, the city explained, with respect to each requested modification, how the overall design of the building with the modification better meets the applicable guidelines than if the design adhered to the particular design standard at issue.[2] Although *1219 the city did not expressly *254 set out an "interpretation" of the better-meets standard, the city's understanding of the meaning of that standard and how it is to be applied is readily discernible from the city's findings and explanation. The city was not required to do more than that. See, e.g. , Green v. Douglas County , 245 Or. App. 430, 438, 263 P.3d 355 (2011) ("[T]o be sufficient, an interpretation must suffice to identify and explain in writing the decisionmaker's understanding of the meaning of the local legislation." (Internal quotation marks omitted.)); see also Alliance for Responsible Land Use v. Deschutes County , 149 Or. App. 259, 266-67, 942 P.2d 836 (1997), rev. dismissed , 327 Or. 555, 971 P.2d 411 (1998) (holding that county's interpretation was reviewable where the county's findings made clear how the standard was being interpreted and applied).
We turn to petitioner's next argument that the city's interpretation is not plausible. We (and LUBA) must defer to the city's interpretation of its comprehensive plan and land use regulations, unless we determine that the city's interpretation is inconsistent with the express language, purpose, or underlying policy of the comprehensive plan or land use regulation. Siporen v. City of Medford , 349 Or. 247, 259, 243 P.3d 776 (2010). That standard of review is "highly deferential" to the city, and the "existence of a stronger or more logical interpretation does not render a weaker or less logical interpretation 'implausible.' " Mark Latham Excavation, Inc. v. Deschutes County , 250 Or. App. 543, 555, 281 P.3d 644 (2012). Our task then is to determine whether the city's interpretation of the better-meets standard in PCC 33.825.040 " 'plausibly accounts for the text and context' " of that provision.
*255 Friends of the Hood River Waterfront v. City of Hood River , 263 Or. App. 80, 89, 326 P.3d 1229 (2014) (quoting Siporen , 349 Or. at 262, 243 P.3d 776 ). As relevant here, to approve the requested modifications to the CMP Design Standards, the city had to plausibly account for the text of PCC 33.835.040(A), which required that, to allow a modification to a design standard, the "resulting development will better meet the applicable design guidelines."
As explained above, the city examined each of the five modification requests and made specific findings as to whether the overall development with the requested modification better met the identified, applicable guidelines than a development that met the particular design standard being modified. See 296 Or. App. at 253 n. 2, 437 P.3d 1218-19 n. 2 (briefly summarizing those findings). The city also expressly interpreted the better-meets standard to not require it to consider the effects of the modifications cumulatively.
In rejecting petitioners' challenge below, LUBA concluded:
"[P]etitioners have not established that the city council erred in evaluating all design changes related to a proposed modification, in determining whether the resulting development better meets applicable guidelines. To the extent the city council's comparative approach is based on an interpretation of the relevant PCC and CMP language, the city council's interpretations are entitled to deferential review under ORS 197.829(1), and petitioners make no attempt to establish that the city council's apparent understanding of the relevant language is reversible under that deferential standard of review. Even in the absence of an interpretation, we see no error in applying PCC 33.825.040(A) in a manner that evaluates the proposed modification in context with associated design changes. The nature of design review often involves tradeoffs and balancing between design features to achieve a more optimal overall design under the applicable guidelines."
(Citations omitted.)
Petitioners now argue that the city's interpretation is not plausible because it compared the overall project with the modification *1220 request to a prior proposed design that also *256 did not meet design standards, instead of comparing it to a hypothetical design that met all guidelines and standards.
We first reject certain of petitioners' characterizations of the city's interpretation.[3] Throughout the city's discussion of the five requested modifications, the city consistently compared the overall project design with modifications (that is, the "resulting development") to a building design that instead met the particular design standard at issue, to determine if the modification better met the identified, applicable guidelines implicated by the modification. In doing so, the city used as a comparison either the standard-meeting design that was part of the proposal before the modification request-see, e.g. , the modification to the building height at the southwest corner-or a hypothetical standard-meeting design-see, e.g. , the modification to retail frontage-depending on what was appropriate under the circumstances for the particular modification request at issue. However, contrary to some of petitioners' assertions, the city did not in any instance compare the resulting development to a design that also did not meet the design standard at issue.
Second, we conclude that the city's interpretation is plausible and entitled to deference. Again, the better-meets standard is that "[t]he resulting development will better meet the applicable design guidelines." The city's interpretation plausibly accounts for all of the text of that provision because it requires looking at the "resulting development" (that is, the overall project design with modifications) and determining whether that design will "better meet" the guidelines "applicable" to the modification at issue than a design would without the requested modification at issue (that is, compared to a design that meets the design standard at issue). Contrary to petitioners' argument, the city *257 did not merely consider whether the applicable guidelines were "met," the city expressly considered whether the applicable guidelines were "better" met by the resulting development by explaining what was "better" about the resulting design with the modification at issue. See Webster's Third New Int'l Dictionary 209 (unabridged ed. 2002) (defining "better" when used as an adverb as "1 a : in a superior or more excellent manner *** b : more desirably : PREFERABLY *** 2 a : to a higher or greater degree *** b : more").
However, petitioners assert that the city's interpretation is implausible because it allows the city to use a comparator that does not simultaneously meet all guidelines and standards without any modifications. We understand petitioner to be asserting that the city's interpretation is implausible because it allows the city to look at each design-standard modification in isolation. Although petitioners' reading of the better-meets standard may be a plausible one, it does not render the city's interpretation implausible. The city's interpretation is plausible because it accounts for all of the text of the standard and gives the city a functional way in which to apply that standard to the proposed project, without having to also create a fully-realized, different, and hypothetical project that is not being proposed. Nothing in the text of PCC 33.825.040 requires such a comparison.
Finally, we reject petitioners' assertion that the better-meets standard requires that, "if the modification is to a public amenity, then the mitigation necessary to 'better meet' a guideline must compensate for this shortfall by providing a public benefit that is of a similar quality or character that exceeds the 'applicable guidelines' in some respect." There is nothing in the text or context of PCC 33.825.040 that suggests, let alone requires, that the better-meets analysis must be applied in a manner that is different or more rigorous when a public amenity design standard is at issue than when applied to any other design standard. Accordingly, we reject *1221 petitioners challenge to the city's interpretation of the better-meets standard and defer to that interpretation on review.
Within their first assignment of error, petitioners also make several arguments that challenge the city's specific *258 better-meets determination on certain modifications as applying an implausible interpretation. We briefly address those specific challenges.[4]
Petitioners challenge on three bases the city's allowance of the modification to the height of the building at the southwest corner of the project. First, petitioners assert that the city erred by comparing the taller building with a "clipped" corner to a design with a shorter building that extended all the way to the corner because, without the "clipped" corner, the public square did not meet the minimum square footage requirement. We reject petitioners' argument because, as explained above, the city's interpretation, which permits the city to address each design-standard modification in isolation, is a plausible interpretation of the better-meets standard. The size of the public square was not at issue in the building height modification request because the "resulting development" met that standard. Rather, the issue was whether a taller building, which then allowed for the clipped corner, better met the guidelines than a shorter building without the clipped corner.
Second, petitioners argue that the building height has nothing to do with clipping the corner of the building and should not have been considered by the city. Again, we reject petitioners' argument as contrary to the city's plausible interpretation of the better-meets standard. The city could consider the whole "resulting development," including the clipped corner, to determine if that resulting development better met the guidelines than without the requested modification.
Third, petitioners argue that the taller building did not better meet CMP Design Guideline 7.B.3-optimize solar exposure to the public square-because the clipped *259 corner was necessary to just "meet" the guideline; it does not "better meet" it. Although the city did not expressly name that guideline, contrary to petitioners' assertion, the city did expressly determine that the "solar access is improved over minimum requirements by eliminating the south portion of the west wing and by the transparent design of the rooftop amenity space." (Emphasis added.) Petitioners do not claim that that finding lacked substantial evidence to support it.
Petitioners also assert that the city erred in allowing the panhandle modification-that is, allowing a dimension of the public square to be less than 100 feet. Petitioners argue that the city impermissibly focused on the effect that the panhandle had on connecting the square to the transit corner and did not consider the size of the square. Again, petitioners' arguments are based in an interpretation of the better-meets standard that the city did not adopt. The city was permitted to consider the effect of the overall "resulting development"-including that it connected the square to the transit stop. Moreover, the city did consider the size of the square, explaining, among other things, that "[i]t also interprets [the public square minimum square footage] standard to require a minimum 10,000 square foot space for the square, with an additional area adding up to 16,000 [square feet], as further described below, and concludes the guidelines are better met by this design than a compliant design that extends the west wing further south to NW Pettygrove St." The city was not required to focus on only the size of the square, or to require some sort of public amenity "mitigation" before allowing the modification.
Accordingly, we reject petitioners' first assignment of error.
In their second assignment of error, which also relates to the better-meets *1222 standard, petitioners argue that the city's decision lacks substantial reason because the city "failed to adequately explain how it determined which of the guidelines were 'applicable' in order to conclude that they were better met as a result of the modified proposal." "Substantial reason" is a component of the substantial evidence standard of review and requires "an explanation *260 connecting the facts of the case and the result reached." See, e.g. , Rogue Advocates v. Jackson County , 282 Or. App. 381, 389, 385 P.3d 1262 (2016). In the land use context, our role on review of a substantial evidence challenge is "to ensure that LUBA has followed the proper 'substantial evidence' standard in reviewing the city's decision." Gunderson, LLC v. City of Portland , 243 Or. App. 612, 636, 259 P.3d 1007 (2011), aff'd , 352 Or. 648, 290 P.3d 803 (2012) (internal quotation marks omitted). Under that standard of review, "we will affirm unless there is no evidence to support the city's finding or the evidence in the case is so at odds with LUBA's evaluation that a reviewing court could infer that LUBA had misunderstood or misapplied its scope of review." Id. (internal quotation marks omitted).
Before LUBA, petitioners argued that the city failed to address all of the guidelines in determining if the modifications satisfied the better-meets standard, failed to explain "how the City balanced the 'applicable design guidelines' to determine that they were better met," and failed to address CMP Design Guideline 4 (appropriately scaled buildings) with respect to the building height modification, and CMP Design Guideline 7.B (square to be a "significant, iconic, urban place") with respect to the panhandle modification. However, petitioners did not raise the "substantial reason" argument that they now assert on review before us.
Because petitioners failed to raise a "substantial reason" argument below, LUBA was not on notice that it needed to address such an argument. Instead, LUBA addressed the arguments that petitioners did present. Thus, LUBA determined that (1) the city was only required to address guidelines that were "applicable" to the modification; that is, the city did not have to address all the guidelines or balance the guidelines; (2) CMP Design Guideline 4 was applicable to the building height modification, but the city's discussion of that guideline in a different section of its decision demonstrated that that guideline was "better met" by the modification, and (3) the city's discussion of CMP Design Guideline 7 in different sections of its decision sufficiently explained how the "panhandle" positively contributed to the public square's overall design.
*261 As noted above, petitioners frame their assignment of error on review to us as a challenge to the city's lack of substantial reason in explaining what guidelines were applicable. That assignment, as framed, is unpreserved and, thus, we do not address it. See Willamette Oaks, LLC v. City of Eugene , 248 Or. App. 212, 225, 273 P.3d 219 (2012) (preservation requirement applies to review of LUBA orders).
However, much of the substance of petitioners' argument is that LUBA erred in evaluating the city's failure to explicitly address CMP Design Guidelines 4 and 7.B in its better-meets analysis because LUBA relied on findings in the city's decision not located in the better-meets analysis section of its decision.[5] We briefly address that specific argument because it was preserved for our review.
Again, as set out above, in a challenge to the findings of the city based on substantial evidence and substantial reason, our role is to determine if LUBA applied the correct scope of its review in reviewing the city's decision. Part of that scope of LUBA's review in such a challenge is that LUBA is to look at the whole record. ORS 197.835(9)(a)(C) ("[T]he board shall reverse or remand the land use decision under review if the board finds *** [t]he local government *** [m]ade a decision not supported by substantial evidence in the whole record[.]"); Younger v. City of Portland , 305 Or. 346, 356, 752 P.2d 262 (1988) (reference to the "whole record" is a direction "to evaluate the substantiality of supporting evidence by considering all the evidence in the record). Reviewing for a sufficient explanation-that is, *1223 for substantial reason-which is a component of substantial evidence, thus requires that LUBA consider the entirety of the city's findings and explanation in its decision.
With that understanding of LUBA's scope of review, we conclude that LUBA properly understood and applied its scope of review when it considered the city's findings and explanation in its entirety-including sections more generally discussing the CMP Design Guidelines and discussing the "purpose" requirement for allowing a modification-to *262 determine if the city made sufficient findings and provided sufficient explanation to support its better-meets determinations for the requested modifications. Moreover, the city's discussion in its entirety did include consideration of neighborhood building scale with respect to the building height modification and overall public square design with respect to the panhandle modification. Accordingly, we reject petitioners' second assignment of error.
In their third and final assignment of error, petitioners argue that the city improperly interpreted and applied CMP Design Guideline 7.C, NW Quimby Parcel (Guideline 7.C). That guideline sets out that the parcel is to
"[p]rovide a multi-use street and open space that links the neighborhood park and square to the south and development to the north, and serves primarily as a pedestrian and bicycle connection."
Guideline 7.C also contains a "background" section and eight subparts that provide more specific guidance, as follows:
"A parcel that would extend NW Quimby Street between NW 20th and 21st Avenues is currently private property and owned by Con-way. The parcel is designated as a local street in the Transportation Element of the City of Portland Comprehensive Plan.
"There will be a comprehensive Master Planning process to design the neighborhood park and develop design ideas for the Quimby parcel. The design of this parcel will be important in that it is envisioned to have special qualities that allow it to successfully link the neighborhood park and square to the south with private development to the north. Design improvements proposed for the Quimby parcel are subject to BDS Design Review and approval by the Portland Bureau of Transportation.
"Based on the traffic analysis conducted for the Master Plan and on the desire to carefully integrate the Quimby parcel with design of a neighborhood park and adjacent development, through pedestrian and bicycle access is the priority transportation function for the parcel. The following design guidelines will be used during the design process, to guide specific design proposals for the Quimby parcel:
*263 "7.C.1 Provide through pedestrian and bicycle connections between NW 21st and 20th.
"7.C.2 Provide emergency and service access as needed to adjacent developments.
"7.C.3 As needed, provide access to building entrances and pedestrian accessways to the north of the parcel.
"7.C.4 Provide transitions to hard and landscape elements included in the neighborhood park to the south of the parcel.
"7.C.5 Provide public access easements.
"7.C.6 Accommodate underground public utilities as needed.
"7.C.7 Provide a location for a flexible festival street to host a farmers market, art walk or other programmed neighborhood events.
"7.C.8 Design the festival street to reflect the character of the potential square on the west end as well as the neighborhood park on the east end."
In applying Guideline 7.C, the city found, in relevant part:
"[T]he vacated NW Quimby Festival Street will be redeveloped as a 60-foot wide private Festival Street that connects the future neighborhood park with the transit on NW 21st Ave, with direct access to the north-south accessway, the breezeway leading to the square, and then further south to NW Pettygrove St. The parcel will provide direct pedestrian and bicycle connections between the public park and other points to the east and the NW 21st transit stop. This link to transit *1224 ensures the parcel will primarily serve pedestrians and bicyclists."
On review to LUBA, petitioners argued that the city's application of Guideline 7.C ignored the text that required a direct link between NW Quimby and the public square to the south and the development to the north. LUBA disagreed, concluding:
"We agree with respondents that Guideline 7C requires that NW Quimby Street itself functions as the required link between development to the north and south of it, and does not require that development to the south on *264 Block 290 West or elsewhere be designed in any particular way. Specifically, Guideline 7C does not require that development on the northern boundary of Block 290 West be designed to include a breezeway or pedestrian connection to allow direct access between the western half of NW Quimby Street and the public square. As designed, the NW Quimby 'festival street' will run east-west across the northern boundaries of Block 290 West and a portion of Block 290 East, and provide links or connections via the pedestrian accessway between development to the north and the neighborhood park and public square (via the breezeway in the east wing) to the south. Petitioners have not established that CMP Design Guideline 7C requires more."
(Emphasis in original.)
As with petitioners' first assignment of error, we review the city's interpretation of Guideline 7.C to determine if it is plausible. See, e.g. , Green , 245 Or. App. at 437, 263 P.3d 355.
Petitioners argue that the city's interpretation is not plausible because it is inconsistent with the plain text of Guideline 7.C, which, petitioners assert, requires a direct connection between NW Quimby Street and the public square. Petitioners assert that the only way NW Quimby-an east-west running street-can link to both the square and the park is if there is a direct "open space" link via a path or breezeway from NW Quimby to the square. Petitioners further argue that the use of the term "open space" in the guideline signals that open space, in addition to the multi-use street itself, is to be used to create that direct link. Petitioners argue that their interpretation is supported by the context of how NW Quimby is described in other guidelines as supporting or extending park and square activities, and in maps of the lot north of NW Quimby that reference requirements for buildings that front a public square.
Respondents respond that the city's interpretation that NW Quimby, itself, provides the link between the park and square and development to the north is plausible. As respondents point out, "Quimby Street functions as a link between all of the uses described in this guideline. It connects to a pedestrian north-south accessway which provides direct access to the park, square and development south of Quimby Street. Quimby Street also connects to development *265 to the north." Respondents argue that Guideline 7.C does not require any particular type of design for a link between the uses, and nothing in the text of that guideline precludes the design link proposed here. Furthermore, respondents point out that the city knew how to require a direct connection as advanced by petitioners by requiring a "ground plane connection" between the park and the square in CMP Design Guideline 10.C. If the city had intended to require the same connection to NW Quimby, respondents assert that the city would have said that in Guideline 7.C.
We agree with respondents and LUBA that the city plausibly interpreted Guideline 7.C. Nothing in that guideline requires a direct pathway connection between NW Quimby and the public square through the proposed building. As provided in the "background" section for Guideline 7.C. that is not the "link" envisioned by that guideline. Rather, it provides that "[t]he design of this parcel will be important in that it is envisioned to have special qualities that allow it to successfully link the neighborhood park and square to the south with private development to the north." (Emphasis added.) The eight subparts of Guideline 7.C emphasize that it is through design elements to NW Quimby itself that the link will be created by providing through pedestrian and bicycle access on the street and by designing the street "to reflect the character of the potential square on the west end as well as the neighborhood park on the east end." The city accounted for the text of the entire Guideline 7.C by explaining that *1225 NW Quimby Street, itself, would function as the required link between the park and square and development to the north by providing direct access to the park, and to the north-south accessway and breezeway leading to the square.
Accordingly, we reject petitioners' third assignment of error.
Affirmed.

PCC 33.825.040 provides, in part:
"The review body may consider modification of site-related development standards, including the sign standards of Chapters 32.32 and 32.34 of the Sign Code, as part of the design review process. *** The review body will approve requested modifications if it finds that the applicant has shown that the following approval criteria are met:
"A. Better meets design guidelines. The resulting development will better meet the applicable design guidelines; and
"B. Purpose of the standard. On balance, the proposal will be consistent with the purpose of the standard for which a modification is requested."

The city demonstrated its interpretation through its explanation of the comparisons it was making to determine if a modification better met an identified guideline. For example, with respect to each modification, the city made the following explanations, among others: (1) increasing the height of the southwest corner of the building better met identified guidelines because it allowed for a private amenity space to be moved to the roof (the only purpose of the increased height) and out of an area next to the square (a design that met the height standard); (2) reducing the depth of retail space fronting the square and reducing the amount of retail on one side of the square better met identified guidelines than a design that met the standard but would have less overall retail frontage or reduced public space; (3) reducing the setback of the upper floor of the east wing better met identified guidelines than a façade that met standard because stepping back the top floor would disrupt the coherent design; (4) reducing the dimensions of the square at the southwest corner for the "panhandle" and reducing the height of the breezeway to the park better met the identified guidelines than a design that had an enclosed square without the "panhandle" and a design with a full height breezeway; (5) reducing the width of bicycle long-term parking spaces better met identified guidelines because it allowed bicycle storage to be moved to the parking garage, freeing up space for the public bicycle station.

We likewise reject petitioners' assertions that the "resulting development" did not meet the design guidelines, as support for their argument that the city's interpretation is implausible. For example, petitioners assert that "at no point did any proposal actually meet the design guidelines and therefore, by definition, it did not 'better meet' the same." Those assertions are contrary to the record. The city specifically found that the resulting development did meet all design guidelines, and, except with respect to CMP Design Guideline 7.C, discussed below, 296 Or. App. at 263-65, 437 P.3d 1215, petitioners have not challenged those findings on review.

Petitioners also make a final argument that that the city's findings lack substantial reason because they "provide no explanation of how the various design components were measured against the design guidelines." It is unclear to us how this argument relates to whether the city's interpretation of the better-meets standard is plausible. However, we reject that argument because petitioners fail to explain how LUBA misunderstood or misapplied its standard of review in determining whether the city's decision lacked substantial evidence or reason. See 296 Or. App. at 260-61, 437 P.3d 1215 (explaining our standard of review of a challenge to the city's decision on substantial reason grounds).

We do not address petitioners' arguments relating to CMP Design Guidelines 7.A, 7.B.8, and 7.C because petitioners did not preserve those arguments for our review.