Filed: November 8, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

GUNDERSON, LLC,

Petitioner on Review,

v.

CITY OF PORTLAND,

Respondent on Review,

and

FRIENDS OF CATHEDRAL PARK
NEIGHBORHOOD ASSOCIATION, et al.,

Respondents below.

(LUBA 2010039)

_____

WORKING WATERFRONT COALITION,

Petitioner on Review,

v.

CITY OF PORTLAND,

Respondent on Review,

and

FRIENDS OF CATHEDRAL PARK
NEIGHBORHOOD ASSOCIATION, et al.,

Respondents below.

(LUBA 2010040)

_____

SCHNITZER STEEL INDUSTRIES, INC.,

Petitioner on Review,

v.

CITY OF PORTLAND,

Respondent on Review,

and

FRIENDS OF CATHEDRAL PARK
NEIGHBORHOOD ASSOCIATION, et al.,

Respondents below.

(LUBA 2010041)
(CA A147803; SC S059735)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 12, 2012.

Phillip E. Grillo, Davis Wright Tremaine LLP, Portland, argued the cause and filed the joint brief for petitioners on review. With him on the joint brief were Roger A. Alfred, Davis Wright Tremaine LLP, Portland, for petitioner on review Working Waterfront Coalition; Robyn Ridler Aoyagi, Tonkon Torp LLP, Portland, for petitioner on review Gunderson, LLC; and Steven L. Pfeiffer, Perkins Coie LLP, Portland, for petitioner on review Schnitzer Steel Industries, Inc.

Linly F. Rees, Deputy City Attorney, Portland, argued the cause and filed the brief for respondent on review. With her on the brief was Kathryn S. Beaumont, Chief Deputy City Attorney, City of Portland.

Maja K. Haium, Salem, filed the brief for *amicus curiae* League of Oregon Cities.

LANDAU, J.

The decision of the Court of Appeals is affirmed. The final order of the Land Use Board of Appeals is affirmed in part and reversed in part, and the case is remanded to the Land Use Board of Appeals for further proceedings.


*Judicial Review from the final order of the Land Use Board of Appeals.
 243 Or App 612, 259 P3d 1007 (2011).

LANDAU, J.

At issue in this case is the lawfulness of a portion of the City of Portland's Willamette River Greenway Plan that regulates uses of industrial and other urban land along a portion of the Willamette River known as the "North Reach." Specifically, the issue is whether the City of Portland (city) has authority to regulate development within the North Reach. Petitioners, who represent various industrial interests within the affected area of the city's plan, contend that the law permits the city to regulate only "intensification" or "changes" to existing uses and otherwise does not permit the regulation of existing industrial or other urban uses or other changes to such uses within the North Reach. The Land Use Board of Appeals rejected that argument, and the Court of Appeals affirmed. For the reasons that follow, we likewise reject petitioners' argument and affirm the decision of the Court of Appeals.

## I. BACKGROUND

A.    *Legislative Creation of the Willamette River Greenway*

In 1973, the Oregon Legislative Assembly established the Willamette River Greenway, a corridor of protected land located along the banks of the river. The legislature found that the development and maintenance of such a greenway is necessary "to protect and preserve the natural, scenic and recreational qualities of lands along the Willamette River," as well as "to preserve and restore historical sites, structures, facilities and objects on land along the Willamette River for public education and enjoyment[.]" ORS 390.314(1).

The legislature expressed recognition of "the need of the people of this state

1

for existing residential, commercial and agricultural use of lands along the Willamette River" and also the need "to permit the continuation of existing uses of lands that are included within such greenway[.]" ORS 390.314(2)(b). At the same time, the legislature recognized the need "to limit the intensification and change in the use of such lands so that such uses shall remain, to the greatest possible degree, compatible with the preservation of the natural, scenic, historical and recreational qualities of such lands." *Id.*

The legislature placed primary responsibility for the coordination of the development and maintenance of the Greenway with the State Parks and Recreation Department (department). ORS 390.314(2)(d). The legislature then charged the department, in cooperation with the local governments that have greenway lands within their boundaries, to prepare a plan for the development and management of the Greenway. ORS 390.318(1). Among other things, the plan is required to specify the boundaries of the Greenway, which must include all lands situated within 150 feet of the ordinary low-water line on each side of the Willamette River, as well as all islands, state parks, and state recreation areas located along the river. *Id.*

The department was required to submit the plan -- either as a whole or as individual plan segments -- for approval by the Land Conservation and Development Commission (LCDC or commission). ORS 390.322(1). The commission was authorized either to approve the plan, revise it, or require revision by the department or the affected local governments. *Id.*

B.    *Adoption of Goal 15*

In 1975, the department, in cooperation with nine counties and other local

2

governments along the Greenway, submitted to LCDC a preliminary greenway plan, a greenway goal, and policies for a completed greenway plan. On December 6, 1975, the commission adopted the Willamette River Greenway Program, consisting of an order adopting a Preliminary Willamette River Greenway Plan and Statewide Planning Goal 15 (Goal 15).

Goal 15 declares that "[t]he qualities of the Willamette River Greenway shall be protected, conserved, enhanced and maintained consistent with the lawful uses present on December 6, 1975[,]" the date that LCDC adopted the goal. OAR 660-015-0005; Goal 15, Paragraph A(1). It further provides that "[i]ntensification of uses, changes in uses or developments may be permitted" after that date only so long as they are consistent with, among other things, the Willamette River Greenway statute, Goal 15, and other statewide planning goals. *Id.* Goal 15 defines "change of use" to mean "making a different use of the land or water than that which existed on December 6, 1975." OAR 660-015-0005; Goal 15, Paragraph K(1). A "change of use" does not include "a change of use of a building or other structure which does not substantially alter or affect the land or water upon which it is situated." *Id.* Goal 15 also defines "intensification" of existing uses. That term means "any additions which increase or expand the area or amount of an existing use, or the level of activity." OAR 660-015-0005; Goal 15, Paragraph K(3). It does not include "[m]aintenance and repair usual and necessary for the continuance of an existing use[.]" *Id.* Goal 15 does not define the term "developments" as it is used in the goal.

Goal 15 provides that each city and county in which the Greenway is

3

located must incorporate portions of the Willamette River Greenway Plan into its comprehensive plan, implementing ordinances, and other implementing measures. OAR 660-015-0005; Goal 15, Paragraph E. Among other things, each comprehensive plan must designate "the uses to be permitted for the rural and urban areas of each jurisdiction," which must be consistent with the Willamette River Greenway Plan. OAR 660-015-0005; Goal 15, Paragraph E(2).

Those comprehensive plans and implementing measures must provide for protection of agricultural lands, protection of recreational needs and adequate public access to the river, protection of significant fish and wildlife habitats, preservation of scenic qualities and viewpoints, protection of public safety, and enhancement of a "vegetative fringe" along the river. OAR 660-015-0005; Goal 15, Paragraph C(3). Goal 15 provides that developments

> "shall be directed away from the river to the greatest possible degree; provided, however, lands committed to urban uses within the Greenway shall be permitted to continue as urban uses, including port, industrial, commercial and residential uses, uses pertaining to navigational requirements, water and land access needs and related facilities[.]"

OAR 660-015-0005; Goal 15, Paragraph C(3)(j).

Measures for managing uses within the Greenway include exclusive farm-use zoning of agricultural lands within the Greenway, floodplain zoning, and open-space zoning. OAR 660-015-0005; Goal 15, Paragraph F. Cities and counties are also required to "establish provisions by ordinance for the review of intensifications, changes of use or developments to ensure their compatibility with the Willamette River Greenway." OAR 660-015-0005; Goal 15, Paragraph F(3). Those ordinances must include "[t]he review of

4

intensification, changes of use and developments as authorized by the Comprehensive Plan and zoning ordinance to insure their compatibility with the Greenway statutes and to insure that the best possible appearance, landscaping and public access are provided." OAR 660-015-0005; Goal 15, Paragraph F(3)(b). The review must include findings that the intensification, change of use, or development "will provide the maximum possible landscaped area, open space or vegetation between the activity and the river[.]" OAR 660-015-0005; Goal 15, Paragraph F(3)(b)(1).

C.      *The City of Portland's North Reach River Plan*

In 1979, the City of Portland adopted its Willamette River Greenway Plan, which included amendments to the city's comprehensive plan and zoning code. LCDC acknowledged the plan in 1981, as part of its acknowledgement of the city's comprehensive plan. In 1987, the city amended the plan, which LCDC acknowledged as a post-acknowledgment plan amendment. In brief, the city's plan established Willamette River Greenway Plan boundaries and applied "greenway overlay zones" to land within the boundaries, including River Industrial, River General, and River Recreational overlays. Development within the overlay zones was required to comply with certain standards, including setbacks and landscaping. In addition, any development within a prescribed distance from the river banks was subject to a Greenway Review process.

In 2004, the city initiated a process by which it intended to update and amend its Willamette Greenway Plan. One phase of that process involved the segment of the Greenway located along the 12-mile stretch of the Willamette River from approximately the Broadway Bridge to the confluence with the Columbia River. The

area, described as the "North Reach," includes approximately 5,500 acres of industrial area known as the Portland Harbor, which contains a significant portion of the city's industrial land base. The North Reach also contains remnant bottomland hardwood forests, upland forests, wetlands, streams, riparian corridors, beaches, and islands. The river within the North Reach has been designated as a special habitat for several species of endangered salmon that spawn in the area.

The "North Reach River Plan," which the parties refer to as the "NRRP," amends the existing plan in a number of ways, two of which are of particular significance to this litigation.

The first of the two pertinent amendments in the NRRP is the creation of a new "River Environmental" (RE) overlay zone that applies to approximately 423 acres of riverfront property within the North Reach. The new overlay zone does not change the uses allowed by the underlying base zones, but it does alter the manner in which development is allowed to occur in the overlay zone.

Development within the overlay zone must comply with a "River Review" process, which generally requires the development applicant to mitigate any unavoidable natural-resource losses that will occur as a result of that development. The NRRP states a preference for mitigation by planting new vegetation elsewhere on the development site. But, if on-site mitigation is not feasible, it permits mitigation by planting new vegetation off site at an approved "River Restoration Site." In the alternative, the plan allows an applicant to pay a fee in lieu of planting vegetation or to buy "mitigation credits" from a certified mitigation bank.

The second of the two pertinent amendments in the NRRP is the imposition of "vegetation enhancement standards" on *all* River Overlay property in the North Reach, not just property located in the RE overlay zone. The vegetation enhancement standards apply to new development and exterior alterations within the River Overlay zones. Applicants for such development or alteration may satisfy the standards by spending an amount equal to one percent of the development or enhancement project value -- up to a maximum of $200,000 -- on one of three options: (1) planting vegetation on an area of the site that is within the River Overlay zone; (2) constructing an "ecoroof" on the site; or (3) contributing to the River Restoration Fund for planting vegetation on city-owned property in the North Reach. The NRRP also sets a cap on the amount of vegetation required equal to 15 percent of the total site area that is located within a River Overlay zone.

D.    *This Litigation*

After the city adopted the NRRP, petitioners appealed the decision to the Land Use Board of Appeals (LUBA). They advanced a number of challenges to the lawfulness of the NRRP, two of which are pertinent to this appeal.

First, petitioners contended that the NRRP unlawfully subjects development of existing industrial uses to the River Review process. They argued that, under Goal 15, existing industrial uses are to be preserved from regulation and that only "intensification" or "changes of use" may be regulated under the Willamette River Greenway Plan. Second, and in a related vein, petitioners argued that the NRRP's vegetation enhancement standards effectively establish setback requirements that prohibit

7

lands currently lawfully committed to urban uses from being used for those purposes.

Although LUBA agreed with some of petitioners' other contentions, it rejected the two that we have just described. LUBA concluded that Goal 15 could not be read as broadly as petitioners urged to preclude the imposition of a review process for development of existing industrial uses. In addition, LUBA concluded that petitioners failed to explain persuasively how the vegetation enhancement standards necessarily impose a setback requirement.

Petitioners sought review in the Court of Appeals, challenging LUBA's decision in a number of respects, including its rejection of their contention that Goal 15 precludes regulation of all but intensification or changes in use of industrial and other urban uses. The Court of Appeals agreed with some of petitioners' contentions, and reversed in part on those grounds, which are not relevant here. It also rejected both of their Goal 15 arguments. *Gunderson, LLC v. City of Portland*, 243 Or App 612, 627, 259 P3d 1007 (2011). The court explained that petitioners' contention that Goal 15 preserves all existing urban uses that do not constitute "intensifications" or "changes" of such uses is undercut by the wording of Goal 15 itself, which expressly authorizes regulation of "development" of those uses, as well. *Id*. at 629. Moreover, the court explained, the statutory context for Goal 15 -- in particular, the statement of legislative findings in ORS 390.314(2) -- makes clear that the purpose of the Greenway "is to preserve the natural, scenic, and recreational qualities of land and historical sites, rather than to preserve industrial and other urban uses of land[.]" *Id*. at 630. The court further noted that petitioners' reading of Goal 15 conflicts with "the basic framework of Oregon's land use

8

planning system[,]" which provides that "local government is the rule, and statewide planning goals and objectives are the exception" in the area of land use planning. *Id*. at 630-31. The court concluded that,

> "[w]ithout more information as to relevant legislative intent, which petitioners do not provide, * * * we will not infer that ORS 390.314(2) and Goal 15 were intended to prohibit the city from regulating development of land committed to urban uses in ways that are consistent with, but different from, the state's mandate to the city to ensure that intensifications or changes of use on such land are compatible with preservation of natural, scenic, historical and recreational qualities of the lands to the greatest extent possible."

*Id*. at 632. According to the Court of Appeals, to demonstrate that a provision of the NRRP violates the portion of Goal 15 that requires that lands currently committed to urban uses be permitted to continue to be used for urban uses, petitioners must show more than the fact that a use is not an intensification or a change of use; rather they must show "that provisions in the NRRP will not permit urban uses, in the language of the goal, 'to continue as urban uses.'" *Id*. at 633.

## II. ANALYSIS

On review, petitioners advance three arguments. First, they contend that the Court of Appeals erred in rejecting their contention that, under both the greenway legislation and Goal 15, "existing urban uses are protected and allowed to continue," and other modifications to existing urban uses are not subject to regulation "unless those modifications constitute either an 'intensification' or a 'change of use,' as those terms are defined in Goal 15." Second, they challenge the Court of Appeals' conclusion that, to demonstrate that the NRRP violates Goal 15's guarantee that existing urban uses can

9

continue, they must show more than that it applies to development other than intensification or changes of those uses. Third, they argue that, even if the Court of Appeals was correct about that, the vegetation enhancement standards contained in the NRRP do preclude a continuation of urban uses, because they effectively require large portions of land currently committed to urban use to be devoted to vegetation enhancement.

In response, the city argues that nothing in the wording of Goal 15 limits the city's authority to the regulation of "intensifications" or "changes" of existing urban uses. To the contrary, the city notes, Goal 15 expressly authorizes the city to regulate "development" that does not amount to intensification or change of existing urban uses. Moreover, the city argues, Goal 15 sets forth only a set of minimum requirements that it must impose under the law and says little, if anything, about what additional requirements the city may impose to further the purposes of the greenway law. As for the vegetation enhancement standards, the city contends that, because petitioners raised no such argument before LUBA or the Court of Appeals, they may not assert it before this court. In any event, the city argues, that argument is built on a false premise that the NRRP requires land committed to urban use to be devoted to vegetation, when the plan makes clear that such is not the case.

A.    *City Authority to Regulate "Development" Under Goal 15*

Petitioners' first argument pertains to the city's authority to regulate industrial or other urban uses under the NRRP that do not amount to intensification or change to existing uses. According to petitioners,

10

"the text, context, and legislative history of Goal 15 all affirm that the economic quality of the Greenway is as vital as its other qualities, that the Greenway statute and Goal 15 protect the continuation of existing economic uses, and that the Greenway Statute and Goal 15 are only intended to limit 'intensifications' and 'changes of use' within the Greenway."

Petitioners' textual argument is predicated on several provisions within Goal 15. First, they observe that Goal 15, Paragraph A(1), requires that "[t]he qualities of the Willamette River Greenway shall be protected, conserved, enhanced and maintained consistent with the lawful uses present" on the date the goal was adopted. Petitioners reason that, obviously, one of the "qualities" that must be protected is the range of economic uses that existed as of the date the goal was adopted. Moreover, they note, Goal 15, Paragraph C(3)(j), guarantees that "lands committed to urban uses" -- which include lands committed to industrial and commercial uses -- "shall be permitted to continue as urban uses[.]" Finally, they note that the only uses that the rule expressly mentions as being subject to regulation are "intensification" and "changes" to those uses.

Petitioners' contextual argument relies principally on ORS 390.314(2), which they read as recognizing the importance of existing commercial and other economic uses. Petitioners reason that, because the legislature apparently considered existing uses to be compatible with the law at the time it was enacted, it makes sense that the law would permit regulation of only intensification or changes to such uses, particularly given that intensification or changes to such uses are the only categories of use that the statute expressly acknowledges are subject to regulation.

As for the "legislative" history of Goal 15, petitioners recite excerpts of

11

documents in the LCDC file on the adoption of the goal, including letters from parties concerned about the protection of existing uses in the Greenway. They also rely on testimony from witnesses at hearings before LCDC concerning the need to protect existing uses within the Greenway. That history, petitioners conclude, shows that LCDC was responding to concerns raised by members of the public about how to protect existing uses within the Greenway.

Because petitioners' arguments implicate the authority of the city, we begin with general principles concerning the authority of such local governments. The city's authority to adopt ordinances is governed by provisions of the Oregon Constitution that provide "home rule" for cities and towns that adopt municipal charters. Under Article XI, section 2, of the Oregon Constitution,

> "[t]he Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]"

The purpose of that provision was "to allow the people of the locality to decide upon the organization of their government and the scope of its powers under its charter without having to obtain statutory authorization from the legislature[.]" *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204 (1978), *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978).

This court has explained that such home-rule municipalities possess authority to enact substantive policies, even in areas also regulated by state law, so long as the local enactment is not "incompatible" with state law:

12

"In such cases, the first inquiry must be whether the local rule in truth is incompatible with the [state] legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by statewide law unless that intention is apparent."

*Id*. at 148-49.

This court's decision in *State ex rel Haley v. City of Troutdale*, 281 Or 203, 576 P2d 1238 (1978), illustrates that principle. In that case, the issue was whether a city's building code, which required double-wall construction, was preempted by the state building code, which imposed a "basic" standard that required only single-wall construction. *Id*. at 205. This court held that, given the authority of home-rule municipalities to enact substantive policies, it was reasonable to construe the state building code as merely establishing a minimum standard that the city was free to exceed:

"We are reluctant to assume that the legislature meant to confine the protection of Oregon residents exclusively to construction standards which it described as 'basic' * * * and to place these beyond the power of local communities to provide additional safeguards for themselves. Certainly that intention is not unambiguously expressed. Until it is, we conclude that local requirements compatible with compliance with the state's standards are not preempted[.]"

*Id*. at 211.

With the foregoing principles in mind, we turn to Goal 15 to determine whether it unambiguously preempts the city from regulating any industrial or other urban uses under the NRRP that do not amount to an intensification or change to an existing use. In brief, we find no such unambiguous preemption.

13

Beginning with the text of Goal 15, we note that nothing in its wording remotely suggests that the authority of local governments to regulate is limited to "intensification" of or "changes" in industrial or other urban uses and does not include "developments," as the NRRP provides. In fact, the text of the goal expressly refers to the regulation of "developments" in addition to "intensification of use" and "changes in use." Petitioners briefly acknowledge that the text of the goal does refer to "developments" in addition to "intensifications of use" and "changes in use," and they remark that "it is not immediately obvious exactly what 'developments' does refer to." They simply assert that, contrary to the ordinary meaning of the term, it could refer narrowly to only "new developments on undeveloped sites." Petitioners cite no justification for conferring on the term such a narrow definition.

But, even assuming for the sake of argument that the term "development" has the narrow meaning that petitioners suggest, the fact remains that Goal 15 does not by its terms limit the authority of local governments to regulate only those items listed. As we have noted above, the goal provides that "[i]ntensification of uses, changes in use or developments *may be* permitted" after the date the rules were adopted only when they are consistent with the Willamette Greenway Statute, the goal itself, and other relevant laws. OAR 660-015-0005; Goal 15, Paragraph A(1) (emphasis added). Thus, the goal states what local governments *may* permit and the conditions under which they are authorized to do so. Nothing in the goal reasonably can be read to establish that local governments *must* permit such intensifications in uses, changes of use, or developments, as petitioners contend.

14

Similarly, while Goal 15, Paragraph C(3)(j), provides that "urban uses within the Greenway shall be permitted to continue as urban uses," nothing in that wording suggests -- much less unambiguously expresses -- that intensifications of those urban uses, or changes in such uses, or developments, are shielded from all local government regulation. Petitioners appear to assume that local government regulation of such alterations in existing use somehow precludes the continuation of the underlying urban uses, an assumption that simply does not necessarily follow.

The statutory context is similarly unavailing to petitioners. ORS 390.314(2) contains no wording that expresses unambiguously a legislative intention to limit local government authority to the regulation of "intensifications" of industrial or other urban uses or "changes" of such uses. To the contrary, the statute declares that,

> "Recognizing the need of the people of this state for existing residential, commercial and agricultural use of lands along the Willamette River, [the legislature] finds it necessary to permit the continuation of existing uses of lands that are included within such greenway; but, for the benefit of the people of this state, also *to limit the intensification and change in the use of such lands* so that such uses shall remain, to the greatest possible degree, compatible with the preservation of the natural, scenic, historical and recreational qualities of such lands."

ORS 390.314(2)(b) (emphasis added). Thus, the legislative findings contained in ORS 390.314(2)(b) do not state a policy of limiting local government authority at all; rather, they state a policy of limiting the intensification and changes in existing residential, commercial, and agricultural uses of lands in the Greenway.

At best, petitioners' argument concerning ORS 390.314(2) amounts to a negative inference, *i.e.*, that, because the legislature mentioned an intention to limit

15

"intensification" and "change" in residential, commercial, and agricultural uses in the Greenway, we may infer that it intended to preclude limitations on those uses to the extent that an "intensification" or "change" is not involved. But even assuming for the sake of argument that such an inference were plausible, it is not the only inference that is plausible, and, as such, it remains insufficient to constitute the unambiguous expression of preemptive intention that is required under *LaGrande/Astoria* and *Haley*.

Finally, turning to the adoption history of Goal 15, we first pause to address a statement in the opinion of the Court of Appeals that, "[w]ithout more information as to relevant legislative intent, which petitioners do not provide," the court was disinclined to read Goal 15 as petitioners urged. *Gunderson, LLC*, 243 Or App at 632. The meaning of an administrative rule is a question of law, governed by the same principles that apply to the interpretation of statutes. *See State v. Hogevoll*, 348 Or 104, 109, 228 P3d 569 (2010) ("In construing an administrative rule, we apply the same analytical framework that applies to the construction of statutes."); *Tye v. McFetridge*, 342 Or 61, 69, 149 P3d 1111 (2006) ("In interpreting an administrative rule * * * our task is the same as that involved in determining the meaning of a statute, which is to discern the meaning of the words used, giving effect to the intent of the body that promulgated the rule."). In construing statutes and administrative rules, we are obliged to determine the correct interpretation, regardless of the nature of the parties' arguments or the quality of the information that they supply to the court. *See, e.g.*, *Dept. of Human Services v. J. R. F.*, 351 Or 570, 579, 273 P3d 87 (2012) (referring to obligation of courts "to interpret the statutes correctly, which includes an obligation to consider relevant context, regardless of whether it was

16

cited by any party"); *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties.").

As for the history on which petitioners rely in this case, suffice it to say that we find nothing in it that provides the sort of unambiguous indication of preemptive intent for which they contend. At best, that history consists of statements of some members of the public and other parties who complained about the need to protect existing industrial, agricultural, and other uses near the Willamette River. Even assuming for the sake of argument that the portions of the history on which petitioners rely constitute fairly representative samples of the comments that were received, the fact remains that it simply does not necessarily follow from those general comments that LCDC, in acknowledging Goal 15, intended to preempt local government authority to regulate development of uses that do not constitute an "intensification" of or "change" in those uses. Nothing that petitioners cite mentions that particular issue.

In short, nothing in the text of Goal 15, its relevant context, or its adoption history supports the conclusion that the goal unambiguously expresses an intention to preclude local governments from regulating developments of industrial and other urban uses that do not constitute "intensifications" of or "changes" to those uses. The Court of Appeals did not err in rejecting petitioners' challenge to the city's NRRP on that ground.

B.    *Continuation of Urban Uses*

Petitioners' second argument is that, once they "demonstrate that modifications to existing urban uses do not constitute either an 'intensification' or 'change'

17

of use," they have established the invalidity of the NRRP. According to petitioners, the Court of Appeals erred in concluding that they are "required to additionally prove that the [c]ity's NRRP regulations will altogether preclude the continuation of urban uses on land committed to urban use," to be excluded from the River Review process.

The argument is largely predicated on the argument that we have just rejected, namely, that Goal 15 permits the local governments to require submission to the River Review process only in cases in which there has been an "intensification" of or "change" in an industrial or other urban use. The Court of Appeals, in likewise rejecting the argument and concluding that "petitioners must demonstrate that provisions in the NRRP will not permit urban uses," *Gunderson*, 243 Or App at 633, did no more than paraphrase the goal itself -- specifically, Goal 15, Paragraph C(3)(j), which provides that "lands committed to urban use within the Greenway shall be permitted to continue as urban uses[.]" We reject petitioners' second argument without further discussion.

C.    *Vegetation Enhancement Standards*

Petitioners' final argument is that, even if the Court of Appeals correctly determined that to establish that the NRRP conflicts with Goal 15 requires proof that land committed to urban use is being prohibited from continuing to be used for urban use, the fact is that the NRRP's vegetation enhancement standards do precisely that. According to petitioners, the vegetation enhancement standards "will prohibit at least 300 acres of land currently committed to urban use in the Greenway from continuing to be used for urban uses."

As the city notes, however, that argument is different from any argument

18

about the vegetation enhancement standards that petitioners have previously asserted in this litigation.  As such, the argument is unpreserved.  In fact, precisely because the argument is unpreserved, we have no way of establishing the accuracy of petitioners' assertion that the vegetation enhancement standards will prohibit 300 acres of land from continuing to be used for urban uses.  The city certainly contests the point.  And, given that the terms of the vegetation enhancement standard portions of the NRRP expressly allow applicants for development to avoid having to plant on site, it is difficult to understand how petitioners' argument necessarily follows.  At all events, we decline to address it for the first time on review.

The decision of the Court of Appeals is affirmed.  The final order of the Land Use Board of Appeals is affirmed in part and reversed in part, and the case is remanded to the Land Use Board of Appeals for further proceedings.

19