No. 22 May 7, 2026 227

IN THE SUPREME COURT OF THE
STATE OF OREGON

Jordan SCHWARTZ,
an individual;
Jonathan Moran, an individual;
Serenity Vapors, LLC,
a domestic limited liability company;
and Torched Illusions, LLC,
a domestic limited liability company,
*Petitioners on Review,*

*and*

Belal YAHYA,
an individual;
and Hookah Cafe, LLC,
dba King's Hookah Lounge,
a domestic limited liability company,
*Plaintiffs -Respondents,*

*v.*

WASHINGTON COUNTY,
a political subdivision of the State of Oregon,
*Respondent on Review.*

(CC 22CV04836) (CA A179834) (SC S071235)

En Banc

On review from the Court of Appeals.*

Argued and submitted June 5, 2025.

Tony L. Aiello, Jr., Tyler Smith & Associates, P.C. Canby, argued the cause and filed the briefs for petitioners on review.

Janet Schroer, Washington County Counsel, Portland, argued the cause for respondent on review. Eamon McMahon, Washington County Counsel, Hillsboro, filed the brief. Also on the brief was John E. Mansfield.

Joseph A. Pickels, Brisbee & Stockton LLC, Hillsboro, filed the brief for *amicus curiae* 21+ Tobacco and Vapor Retail Association.

Philip Thoennes, Assistant Attorney General, Salem, filed the brief for *amicus curiae* State of Oregon. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Lydia Anderson-Dana, Stoll Stoll Berne Lokting & Schlachter P.C., Portland, filed the brief for *amici curiae* African American Tobacco Control Leadership Council, American Cancer Society Cancer Action Network, American Heart Association, American Lung Association, American Medical Association, Campaign for Tobacco-Free Kids, Kaiser Permanente, Oregon Coalition of Local Health Officials, Oregon Medical Association, Oregon Pediatric Society, Parents Against Vaping e-cigarettes, Truth Initiative, and Upstream Public Health.

JAMES, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

_____

* Appeal from Washington County Circuit Court, Andrew R. Erwin, Judge. 332 Or App 342, 550 P3d 20 (2024).

**JAMES, J.**

At issue in this case is the validity of Washington County Ordinance (WCO) 878, which bans the sale of flavored tobacco and flavored synthetic nicotine products to anyone in the county, regardless of age. Plaintiffs—retailers of tobacco and nicotine products with locations in Washington County (the retailers)—filed an action for declaratory and injunctive relief against the county, contending, as relevant here, that Oregon's Tobacco Retailer Licensure scheme (referred to in this opinion as Senate Bill (SB) 587 (2021) and codified at ORS 431A.190 to 431A.220), preempts Washington County's flavored tobacco products ban. The trial court ruled that SB 587 preempts WCO 878, and it entered a final general judgment permanently enjoining defendant Washington County from enforcing that ordinance. Washington County appealed, arguing that the ordinance is a valid exercise of its home rule authority and its coregulatory authority under SB 587. The Court of Appeals reversed the trial court's ruling, holding that SB 587 does not preempt Washington County's flavored tobacco products ban. *Schwartz v. Washington County*, 332 Or App 342, 550 P3d 20 (2024).

In general, a local ordinance adopted by a home rule county in Oregon—which includes Washington County—is preempted by state law only if the local ordinance cannot operate concurrently with a statute on the same subject or if the legislature intended the state law to be exclusive. As we will explain, WCO 878 is not preempted by SB 587 under either test. Accordingly, we affirm the decision of the Court of Appeals.

## I. BACKGROUND

We begin with some background relating to the enactment of Oregon's tobacco retail licensing scheme and Washington County's subsequent adoption of its ordinance banning flavored tobacco products.

A.  *Oregon's Tobacco Retail Licensure Scheme*

In 2021, the legislature enacted SB 587, creating a statewide tobacco retail licensure scheme that requires anyone desiring to sell tobacco products in Oregon to be licensed

by the Department of Revenue (DOR). Or Laws 2021, ch 586. Before SB 587 was enacted, tobacco was the only age-restricted product that Oregon retailers could freely sell without obtaining a license. *See* Video Recording, Senate Committee on Health Care, SB 587, Mar 1, 2021 at 00:4:12 (comments of Rep Kathleen Taylor), https://olis.oregonlegislature.gov (accessed Apr 29, 2026) (so stating).[1] Oregon was one of a small minority of states that did not have a statewide retail licensure program in place for tobacco sales.

By creating a licensing scheme for retailers of tobacco products, SB 587 enabled the DOR to develop an accurate database of current retailers for purposes of oversight and compliance. Indeed, the stated purpose of SB 587 is "to improve enforcement of local ordinances and rules, state laws and rules and federal laws and regulations that govern the retail sale of tobacco products and inhalant delivery systems." ORS 431A.192. In furtherance of that objective, ORS 431A.194 provides:

> "A person may not make a retail sale of a tobacco product or an inhalant delivery system at or from a premises located in this state unless the person sells the tobacco product or inhalant delivery system at or from a premises licensed or otherwise authorized under ORS 431A.198 or ORS 431A.220."

ORS 431A.198(1) provides that "the Department of Revenue shall issue licenses to, and annually renew licenses for, a person that makes retail sales of tobacco products or inhalant delivery systems at qualified premises." And ORS 431A.220 addresses preexisting local ordinances as follows:

> "A city or local public health authority that, on or before January 1, 2021, and pursuant to an ordinance adopted by the governing body of the city or local public health authority, enforced standards described in ORS 431A.218(2)(a) and required that a person that makes retail sales of tobacco products or inhalant delivery systems in an area subject to the jurisdiction of the city or local public health authority hold a license or other authorization issued by the city or local public health authority may continue to enforce the standards and require the license or other authorization on or after January 1, 2022."

---

[1] Before the enactment of SB 587, Oregon required only that distributors of tobacco products be licensed by the DOR.

As ORS 431A.220 indicates, despite the previous absence of a statewide retail tobacco licensing scheme, SB 587 was not enacted on a blank slate. On the contrary, several of Oregon's political subdivisions previously had implemented local programs that required retailers within their subdivisions to obtain a license or other authorization to sell tobacco products. Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Rachel Banks) (noting that "[c]ounties such as Multnomah, Clatsop and Klamath are enforcing strong tobacco retail licenses"). The existence of those local programs led to questions, early in the discussions surrounding SB 587, about whether the statewide program should displace those local licensing programs or whether the local programs should be permitted to continue alongside the statewide licensing program. As Senator Tim Knopp explained,

> "[t]he real question was what to do with the entities that currently have [local tobacco licensing] programs. And, truthfully, the easiest thing to do would just do a statewide preemption and eliminate those [local programs]. However, we recognize that some of the entities who currently have those [programs] may have gone even a little further than what the current state law would be[,] and some of [those entities], maybe all of them, would want to keep those [programs] in place. And so instead of preempting them, I came up with an idea to basically flip that and make them, in terms of the local ordinances, the ones that stay, and the state overlay or mandate wouldn't apply as long as the locals continue their programs. And, so, I think it really allows the best of both worlds and that those who already acted on this are protected and those who don't have a current licensing system will then be licensed by the state."

Video Recording, Senate Committee on Health Care, SB 587, Mar 10, 2021, at 00:44:50 (comments of Sen Tim Knopp), https://olis.oregonlegislature.gov (accessed Apr 29, 2026). Thus, as Senator Knopp stated, the issue was resolved by including in SB 587 a section—later codified at ORS 431A.220—permitting local governments to continue to enforce tobacco ordinances that they had adopted prior to the effective date of SB 587.

SB 587 specifically provides that local governments continue to have coregulatory authority over the sale of

tobacco products, at least to an extent. ORS 431A.218(2), which addresses local regulation, provides that each local public health authority may, among other things:

> "(a)   Enforce, pursuant to an ordinance enacted by the governing body of the local public health authority, standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety in addition to the standards described in paragraph (b) of this subsection, including qualifications for engaging in the retail sale of tobacco products or inhalant delivery systems that are in addition to the qualifications described in ORS 431A.198."[2]

As we will explain in detail later in this opinion, the extent of a local government's authority to enact ordinances governing the sale of tobacco products consistent with ORS 431A.218(2)(a) is at the heart of the dispute between the parties in this case.

B.   *Washington County Ordinance 878*

In the fall of 2021, Washington County held a series of public hearings on flavored tobacco use by teens, and it found that "youth tobacco use is increasing in Washington County and the tobacco industry continues to use strategies that target child[ren] including the advent of new products, like flavored tobacco products." The county therefore concluded that "flavored tobacco *** should not be sold in Washington County."

As noted, under ORS 431A.218(2)(a), the "governing body of the local public health authority" may enact and enforce "standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety[.]" In Washington County's view,

---

[2] Paragraph (b) of ORS 431A.218(2) allows local public health authorities to

"(A) Administer and enforce standards established by state law or rule relating to the regulation of the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety if the local public health authority and the Oregon Health Authority enter into an agreement pursuant to ORS 190.110 [authority of units of local government and state agencies to cooperate]; or

"(B) Perform the duties described in this section in accordance with ORS 431.413(2) or (3) [describing the powers and duties of local public health authorities]."

that statute granted it express authority to enact a ban on flavored tobacco products. Therefore, in November 2021, the Washington County Board of Commissioners, in its capacity as the "local public health authority" for purposes of ORS 431A.218(2)(a), enacted WCO 878, which prohibits, among other things, the sale of "flavored products," defined as

> "[a]ny synthetic nicotine product[3] or tobacco product that contains a taste or smell, other than the taste or smell of tobacco, that is distinguishable by an ordinary consumer either prior to or during the consumption of the product, including, but not limited to, any taste or smell relating to chocolate, cocoa, menthol, mint, wintergreen, vanilla, honey, molasses, fruit, or any candy, dessert, alcoholic beverage, herb, or spice."

WCO 878, Exhibit A, 2.20 B.[4]

C.  *The Present Dispute*

In February 2022, the retailers sued Washington County in circuit court, seeking, among other things, to enjoin its enforcement of WCO 878 on the ground that that ordinance was expressly or implicitly preempted by SB 587. Washington County moved to dismiss the retailers' complaint for failure to state a claim under *former* ORCP 21 A(8) (2019), *renumbered as* ORCP 21 A(1)(h) (2022), arguing that SB 587 permits the challenged ordinance. The retailers then successfully moved for a temporary restraining order to enjoin the county from enforcing WCO 878. And, because the parties had agreed upon the material facts and had sought a ruling on the pleadings as a matter of law, the trial court treated the county's motion to dismiss as the functional equivalent of a motion for summary judgment under ORCP 47 C.

In July 2022, the trial court issued a letter opinion enjoining Washington County from enforcing WCO 878. In September 2022, the court issued a ruling on the county's

---

[3] WCO 878 defines "synthetic nicotine product" as "any product designed for human consumption where the nicotine was created and produced in a laboratory and not derived from tobacco." WCO 878, Exhibit A, 2.20 E.

[4] After its passage, WCO 878 was subject to a citizen-filed ballot measure seeking to repeal that ordinance. The effort failed, and WCO 878 was ratified by Washington County voters in May 2022.

motion to dismiss. The trial court framed the issue before it as whether WCO 878 is the type of ordinance contemplated in ORS 431A.218(2)(a)—an ordinance "enacted by the governing body of the local public health authority [to enforce] standards for regulating the retail sale" of tobacco products. According to the trial court, if WCO 878 is not such an ordinance, then "regardless of the virtue in enacting it, a county ban is unauthorized[] and preempted. If it is, then state law does not expressly or impliedly preempt its ban." The court observed that ORS 431A.218 authorizes local public health authorities to enact standards "in addition to the standards" described elsewhere in the statute. After considering the standards that are set out in SB 587—specifically, the standards set out in ORS 431A.218(2)(a) and (b) and in ORS 431A.198—the court concluded that WCO 878 neither enforces any of the standards set out in SB 587 nor establishes standards or qualifications that are "in addition to" those set out in SB 587. The trial court therefore agreed with the retailers that WCO 878 was preempted by SB 587. Washington County timely appealed.

Before the Court of Appeals, the county argued that the trial court, when it assessed whether WCO 878 was the type of ordinance contemplated by ORS 431A.218(2)(a), was asking the wrong question. According to Washington County, it has home rule authority to protect public health by banning the sale of flavored tobacco products within its jurisdiction and that that exercise of its home rule authority is authorized by SB 587. The county argued that a statute preempts local authority to act only if it does so expressly, and SB 587 does not expressly preempt WCO 878. On the contrary, the county contended, SB 587 contemplates that local governments will regulate tobacco sales by enacting ordinances like WCO 878, insofar as it permits local public health authorities to enforce their own duly enacted "standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety[.]" ORS 431A.218(2)(a). In further support of its argument against preemption, the county emphasized that its local public health authority can simultaneously enforce the state standards set out in SB 587 and its local

ban on the sale of flavored tobacco products, and, thus, the state law and the local ordinance are not in conflict.

The retailers responded by pressing their argument that ORS 431A.218(2)(a) and ORS 431A.220 express the legislature's unambiguous intent to preempt ordinances like WCO 878—namely, ordinances enacted after the effective date of SB 587 and not qualifying as "standards for regulating the retail sale of tobacco products and inhalant delivery systems" permitted under ORS 431A.218. In the retailers' view, WCO 878 is a prohibition and not a "standard for regulating" the sale of tobacco products, and the fact that the legislature chose to limit the ability of local public health authorities to administer local licensing programs concurrently with SB 587 in those ways indicates that it intended to preempt ordinances like WCO 878 that were enacted after the effective date of SB 587.

The Court of Appeals agreed with Washington County, concluding that SB 587 does not preempt WCO 878 and reversing the trial court's ruling. The court observed that this court had held, in *Owen v. City of Portland*, 368 Or 661, 667, 497 P3d 1216 (2021), that preemption depends on whether "a local law is incompatible with state law, either [1] because both cannot operate concurrently or [2] because the legislature meant its law to be exclusive." *Schwartz*, 332 Or App at 355 (brackets in *Schwartz*; internal quotation marks omitted). Applying that standard, the Court of Appeals first examined the text, context, and legislative history of SB 587 to ascertain whether the legislature intended SB 587 to be exclusive. The court stated that that statute does not contain wording expressly indicating that the legislature intended it to preempt local ordinances like WCO 878. *Id.* at 356. Rather, the court stated, ORS 431A.218(2)(a) appears to expressly permit such local ordinances. *Id.* For those reasons, the court concluded that the legislature did not mean for SB 587 to be exclusive. *Id.* at 358. The court then considered whether SB 587 and WCO 878 can operate concurrently. Ultimately, the court held that, because retailers can comply with both Oregon's tobacco retail licensing scheme as set out in SB 587 and WCO 878's prohibition on the sale and distribution of flavored tobacco products by not selling

those products in Washington County, compliance with both the statute and the Washington County ordinance is not impossible; the two schemes can operate concurrently. *Id.* at 359-60.

The retailers sought, and this court allowed, review.

## II.  ANALYSIS

Before this court, the retailers argue that a license issued pursuant to SB 587 "creates a liberty interest and provides express permission to engage in otherwise unlawful conduct." They contend that that liberty interest gives them the right to sell all types of nicotine products and preempts local ordinances that prohibit retailers from fully utilizing their licenses. In the retailers' view, "the very issuance of a license (permission) to engage in conduct provides legislative intent to preclude [local public health authorities] from prohibiting the legislatively authorized conduct." The retailers also argue that WCO 878 is not an ordinance "enacted by the governing body of the local public health authority [to enforce] standards for regulating the retail sale" of tobacco products and, therefore, it is not the type of ordinance that is expressly allowed by ORS 431A.218(2)(a). Washington County, for its part, requests that we affirm the decision of the Court of Appeals on the grounds that (1) WCO 878 is a valid exercise of Washington County's home rule authority, (2) the ordinance is a valid exercise of its coregulatory authority under SB 587, and (3) the retailers have failed to establish that WCO 878 is preempted by SB 587.

As a framework for our analysis, we begin by examining what is required to establish that a state statute preempts a local ordinance.

Since 1906, the authority of local governments to govern themselves has been enshrined in multiple provisions of the Oregon Constitution, collectively known as the "home rule" provisions. Article XI, section 2, provides, in part, "The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]" Likewise, Article IV, section 1(5), provides that the people "reserved" initiative and referendum powers "to the qualified

voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district." Article VI, section 10, provides that "[a] county charter may provide for the exercise by the county of authority over matters of county concern." In addition, ORS 203.035(1) permits counties "by ordinance [to] exercise authority within the county over matters of county concern, to the fullest extent allowed by Constitutions and laws of the United States and of this state, as fully as if each particular power comprised in that authority were specifically listed in ORS 203.030 to 203.075." Washington County is a home rule county, having adopted its home rule charter in 1962.

The validity of local action depends, first, "on whether it is authorized by the local charter or by a statute," and second, "on whether it contravenes state or federal law." *La Grande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adh'd to on recons*, 284 Or 173, 586 P2d 765 (1978). As a preliminary matter, we note that the retailers do not contend that, aside from any conflict with state law, Washington County's adoption of WCO 878 would not be a valid exercise of its home rule authority. Nor could they. Washington County's charter permits the county to exercise its authority over matters of county concern, and there can be no question that one such matter is the health and welfare of its citizens.

Because "both municipalities and the state legislature in many cases have enacted laws in pursuit of substantive objectives, each well within its respective authority, that were arguably inconsistent with one another," we resolve potential conflicts by asking "whether the local rule in truth is incompatible with the [state] legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *Id.* at 148; *see also Northwest Natural Gas Co. v. City of Gresham*, 359 Or 309, 336, 374 P3d 829 (2016) (quoting *La Grande/Astoria*, 281 Or at 148-49); *Owen v. City of Portland*, 368 Or 661, 667, 497 P3d 1215 (2021) (same). The party must overcome the presumption "that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law." *Rogue Valley Sewer Services v. City of Phoenix*, 357 Or 437, 454, 353 P3d 581 (2015).

Beginning with the first question—whether the two laws can coexist—we "interpret local enactments, if possible, to be intended to function consistently with state laws." *La Grande/Astoria*, 281 Or at 148. That is, a local ordinance is not incompatible with state law merely because it regulates in a field in which the state has also regulated. Rather, as the Court of Appeals stated in *Thunderbird Mobile Club v. City of Wilsonville*, 234 Or App 457, 474, 228 P3d 650, *rev den*, 348 Or 524 (2010), "a local law is [incompatible] only to the extent that it 'cannot operate concurrently' with state law, *i.e.,* the operation of local law makes it *impossible* to comply with a state statute." (Emphasis added.) We agree with the Court of Appeals that state and local regulatory incompatibility is assessed by the standard of "impossibility."

Turning to the second question—even if a state law and a local law could logically coexist, the former will be held to preempt the latter if the legislature "unambiguously expresse[d] an intention to preclude local governments from regulating" in the same area. *Gunderson, LLC v. City of Portland*, 352 Or 648, 663, 290 P3d 803 (2012); *see also State ex rel. Haley v. City of Troutdale*, 281 Or 203, 211, 576 P2d 1238 (1978) (because any legislative intent to preempt local action exceeding state "minimum" construction standards was "not unambiguously expressed[,] local requirements compatible with compliance with the state's standards are not preempted"). In *Rogue Valley*, we made a point of emphasizing *Gunderson*'s use of the word "unambiguously." *Rogue Valley*, 357 Or at 454 ("Only where the legislature '*unambiguously* expresses an intention to preclude local governments from regulating' in the same area governed by an applicable statute can that presumption against preemption be overcome." (quoting Gunderson, 352 Or at 663 (emphasis in *Rogue Valley*)). That emphasis bears further repetition. As we have noted, the legislature is well aware of how to use language to signal its intent to preempt local regulation—either by using the word "preempt" specifically or using the phrase "no local authority shall enact." *See, e.g.*, ORS 731.840(4) (specifying that "[t]he State of Oregon hereby preempts the field" and "[n]o county, city, district, or other political subdivision or agency in this state shall so regulate"); ORS 461.030(1) ("no local authority shall enact any

ordinances, rules or regulations in conflict with the provisions hereof").

We turn to apply those principles to the case at issue.

A.  *Is concurrent operation of WCO 878 and SB 587 impossible?*

The retailers argue that WCO 878 is incompatible with SB 587 because the statute and the ordinance cannot operate concurrently, insofar as, in the retailers' view, SB 587 grants them the "right" to sell all types of tobacco products anywhere in the state and WCO 878 prohibits them from selling some tobacco products in Washington County. In other words, the retailers argue, retailers cannot simultaneously have statutory permission to engage in conduct and be prohibited from engaging in the same conduct by a local ordinance. To support that argument, the retailers begin with the uncontroversial premise that SB 587 governs licensure, and a license grants "permission to act"—that is, permission "to engage in a business or occupation or in an activity otherwise unlawful." *Chamber of Commerce of the United States v. Whiting*, 563 US 582, 595, 131 S Ct 1968, 179 L Ed 2d 1031 (2011) ("A license is a right or permission granted in accordance with law *** to engage in some business or occupation, to do some act, or to engage in some transaction which but for such license would be unlawful." (Internal quotation marks omitted.)). The retailers then reason that, because SB 587 grants licensees permission to sell nicotine products, that statute grants licensees a "liberty interest" in selling *all types* of nicotine products. We disagree with that leap. Conditioning the legality of an activity on obtaining a license is not the same thing as conferring a "right" to engage in the activity.

The retailers point to nothing in the text or legislative history of SB 587 that suggests that the legislature intended to confer upon licensees the right to sell all types of tobacco products. SB 587 makes selling tobacco products at unlicensed premises unlawful, ORS 431A.194, and it requires the DOR to "issue licenses to, and annually renew licenses for, a person that makes retail sales of

tobacco products or inhalant delivery systems at qualified premises," ORS 431A.198. The grant of a license under ORS 431A.198, however, does not allow a licensee to do anything other than sell tobacco products according to the terms of SB 587. Those terms include state requirements for premises as described in ORS 431A.198(2), such as requiring premises where tobacco is sold to be fixed and permanent, ORS 431A.198(2)(a), and prohibiting premises where tobacco is sold from being located in areas zoned exclusively for residential use, ORS 431A.198(2)(b). However, although the statute incorporates a definition of the term "tobacco products" that includes many different forms of tobacco,[5] nothing in SB 587 expressly legalizes the sale of tobacco products in general[6] or any tobacco product in particular, and it does not mention flavored tobacco at all.

Logically, the fact that a statute authorizes the government to grant licenses to sell a category of products does not mean that, in enacting that statute, the legislature intended to confer on licensees the right to sell *all* products that might potentially fall into that category. And it does not logically follow that, because licenses authorize the sale of a category of products, local governments are necessarily precluded from banning a subset of products within that category. We need not and do not decide whether regulations concerning discrete products could, in theory, be written

---

[5] ORS 431A.190(5) defines "tobacco products" as having the meaning given that term in ORS 431A.175. ORS 431A.175(1)(b), in turn, defines "tobacco products" as

"(A) Bidis, cigars, cheroots, stogies, periques, granulated, plug cut, crimp cut, ready rubbed and other smoking tobacco, snuff, snuff flour, cavendish, plug and twist tobacco, fine-cut and other chewing tobaccos, shorts, refuse scraps, clippings, cuttings and sweepings of tobacco and other forms of tobacco, prepared in a manner that makes the tobacco suitable for chewing or smoking in a pipe or otherwise, or for both chewing and smoking;

"(B) Cigarettes as defined in ORS 323.010; or

"(C) A device that:

"(i) Can be used to deliver tobacco products to a person using the device; and

"(ii) Has not been approved by the United States Food and Drug Administration for sale as a tobacco cessation product or for any other therapeutic purpose, if the product is marketed and sold solely for the approved purpose."

[6] As previously discussed, the sale of tobacco products was legal before SB 587 was enacted.

in terms so sweeping as to functionally displace a broader licensing scheme; that is not the case here. Washington County's regulation does not deprive the retailers of the functional value of their licenses; it limits only a small subset of products on their shelves. We acknowledge that licensees in Washington County will have a narrower range of products to sell than licensees in other counties, but that discrepancy does not mean that it is *impossible* for the state and local ordinance to operate simultaneously.

B. *Does SB 587 unambiguously express the intent to preclude local ordinances like WCO 878?*

We turn, then, to consider the retailers' argument that WCO 878 is preempted by SB 587 because the legislature intended to preempt such ordinances by enacting ORS 431A.218(2)(a). As we have explained, we will find that the legislature intended to preempt a local ordinance only if that intention is unambiguously expressed in the legislation. We emphasize again, the intent to preclude local regulation must be *unambiguously expressed* in the statute—we will not find it through implication or inference. As we explain below, although the retailers highlight uncertainties in the text of the statute, none of those uncertainties rise to the level of an unambiguous expression of an intent to preempt.

SB 587 includes a section entitled "local regulation," ORS 431A.218. Paragraph (2)(a) of that section provides that local public health authorities may:

"[e]nforce, pursuant to an ordinance enacted by the local public health authority, standards for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety in addition to the standards described in paragraph (b) of this subsection [permitting local public health authorities also to enforce state standards, established by state law or rule, relating to the regulation of the retail sale of tobacco products], including qualifications for engaging in the retail sale of tobacco products or inhalant delivery systems that are in addition to the qualifications described in ORS 431A.198."

The retailers argue that WCO 878 is not a "standard for regulating the retail sale" of tobacco as that phrase is used in ORS 431A.218(2)(a), for three reasons. First, the

retailers point to dictionary definitions of the words "standard"—meaning "something that is established by authority, custom, or general consent as a model or example to be followed : CRITERION, TEST," *Webster's Third New Int'l Dictionary* 2223 (unabridged ed 2002)[7]—and "regulate"—meaning "to govern or direct according to rule" and "to bring under control of law or constituted authority" or to "make regulations for or concerning," *id.* at 1913. Relying on those definitions, the retailers contend that the grant of authority to enact "standards for regulating" the sale of tobacco gives local public health authorities authority to establish "a model or example to be followed" for engaging in the sale of tobacco but it does not directly authorize local governments to adopt regulations on any topic relating to the sale of tobacco products. That is, they contend, by permitting local public health authorities to enact "standards for regulating the retail sale" of tobacco products, SB 587 permits local public health authorities only to "determine *how* or *the manner in which* Nicotine Product sales occur but [not to] determine *whether* they occur." Because, in the retailers' view, an ordinance banning the sale of one type of tobacco product does not concern how or in what manner tobacco products are sold, it is not a "standard for regulating the sale of" tobacco products.

As the dictionary definitions set out above indicate, both "standard" and "regulate" are broad terms, covering a wide array of topics. The statute does include one limitation, however—the standards for regulating the retail sale of tobacco products must be "for purposes related to public health and safety." The retailers' interpretation of the statute would limit what can be a "standard for regulating" the retail sale of tobacco products to rules governing "how or the manner in which" sales can occur, but not to include whether sales of certain products can occur. That interpretation adds words to the statute that the legislature did not include. In addition, that limitation omits what has been inserted by ignoring the phrase "for purposes related to public health and safety." *See* ORS 174.010 (stating legislature's preference that, "[i]n the construction of a statute, the office of the

---

[7] *Black's Law Dictionary* similarly defines "standard" as a "model accepted as correct by custom, consent, or authority." *Black's Law Dictionary* 1699 (12th ed 2024).

judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted").

Whatever uncertainty may exist, however, the critical point is that nothing in ORS 431A.218(2)(a) suggests—much less unambiguously expresses—a legislative intent to limit local ordinances to those that regulate "how or the manner in which" tobacco sales are made.

The retailers' second argument that WCO 878 is not a "standard for regulating the retail sale" of tobacco products is based on the fact that ORS 431A.218(2)(a) provides that a local public health authority may enact and enforce standards for regulating the sale of tobacco products for purposes of public health and safety "*in addition to the standards described in paragraph (b) of this subsection.*" (Emphasis added.) According to the retailers, by including that phrase, the legislature intended to impose "narrow parameters" limiting the types of ordinances that a local public health authority can enact to standards similar to, or akin to, the "standards described in paragraph (b) of this subsection." We disagree.

Paragraph (b) of ORS 431A.218(2) provides that local public health authorities may:

"(A)  Administer and enforce standards established by state law or rule relating to the regulation of the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety if the local public health authority and the Oregon Health Authority enter into an agreement pursuant to ORS 190.110 [authorizing units of local government and state agencies to cooperate]; or

"(B)  Perform the duties described in this section in accordance with ORS 431.413(2) or (3) [describing powers and duties of local public health authorities]."

ORS 431A.218(2)(b). In the retailers' view, the fact that the legislature provided that local standards are "in addition to" the state standards described in paragraph (b) shows that the legislature did not intend to permit local public health authorities to enact ordinances that operate "instead of" or

"in conflict with" state standards. According to the retailers, such an interpretation is necessary to ensure compliance with the requirement of statewide uniformity of standards set out in ORS 431A.218(5)(a).

There are at least two problems with the retailers' argument. One is that it misinterprets ORS 431A.218(5)(a). That statute provides that the Oregon Health Authority shall,

> "[s]ubject to ORS 431A.220 [providing that local governments that adopted their own licensure requirements before the enactment of SB 587 can continue to enforce those requirements], ensure that state standards established by state law and rule regarding the regulation of the retail sale of tobacco products and inhalant delivery systems are administered and enforced consistently throughout this state."

ORS 431A.218(5)(a) requires only that *state standards, established by state law* must be enforced consistently. As previously discussed, the "state standards" set out in SB 587 include requirements for premises where tobacco products are sold as set out in ORS 431A.198. However, by providing that ORS 431A.218(5)(a) is "subject to ORS 431A.220," the statute expressly contemplates exceptions to the requirement of statewide uniformity of state standards, insofar as it recognizes that some local governments will continue to enforce their own preexisting requirements for licenses and premises. And paragraph (5)(a) cannot be understood to prohibit varying local ordinances adopted after the enactment of SB 587 for purposes related to public health and safety, as those are expressly permitted elsewhere in the same section of the statute. ORS 431A.218(2)(a).

Retailers additionally argue that that WCO 878 is not a "standard for regulating the retail sale" of tobacco in that it is a *prohibition* on the retail sale of certain tobacco products and, in the retailers' view, the authority to regulate does not include the authority to prohibit.[8] They con-

---

[8] In support of that proposition, the retailers cite several authorities. *See Kramer v. Lake Oswego*, 365 Or 422, 446, 446 P3d 1 (2019) ("We have held in the context of the public's right to fish that the state *** may regulate and even prohibit the public's right to fish"); *Hillsboro v. Purcell*, 306 Or 547, 554, 761 P2d 510 (1988) ("The relevant distinction is between outright prohibitions *** on the

tend that nothing in SB 587 suggests that the legislature intended to allow local governments to entirely prohibit the sale of tobacco products in their jurisdictions, and, therefore, SB 587 must also preclude local governments from imposing partial bans on certain tobacco products.

Those arguments do not persuade us. First, we are not looking for unambiguous expressions of permission for local regulation, we are looking for unambiguous expressions of prohibition on local regulation. That simply isn't present here. It cannot reasonably be disputed that "regulating" may entail "prohibiting." For instance, ORS 431A.198(2) (defining criteria for premises to qualify for licensure) regulates where tobacco products may be sold, and, thus, by implication at least, it prohibits the sale of tobacco products in premises that do not conform to its requirements. We express no opinion about whether it would be permissible under SB 587 for a local public health authority to entirely prohibit the sale of tobacco products within its jurisdiction, as that issue is not presented here. However, we have no trouble concluding in this case that Washington County is "regulating" the sale of tobacco products in its jurisdiction in the sense of "bring[ing]" the sale of tobacco "under the control of law" or "making regulations for or concerning" the sale of tobacco products. *Webster's* at 1913. The fact that WCO 878 regulates what tobacco products may be sold by prohibiting the sale of some kinds of tobacco products does not mean that it is not a regulation.

To summarize, then, our review of the text of ORS 431A.218(2)(a) suggests that the legislature intended to permit local public health authorities to adopt ordinances

---

one hand, and regulations that do not foreclose expression entirely but regulate when, where and how it can occur."); *Terry v. City of Portland*, 204 Or 478, 511, 269 P2d 544 (1954) (Latourette, J., concurring) ("[The city] may license and regulate, or prohibit entirely ***."); *City of Portland v. Schmidt*, 13 Or 17, 22, 6 P 221 (1885) (distinguishing between the power to "license, regulate, and restrain barrooms and drinking-shops" and the power to "prohibit their sale generally"); ORS 166.173(1) ("A city or county may adopt ordinances to regulate, restrict or prohibit the possession of loaded firearms in public places[.]"); ORS 527.722(1) ("no unit of local government shall *** take any other actions that prohibit, limit, regulate, subject to approval or in any other way affect forest practices"); Or Const, Art XI, § 2 (legal voters have "the exclusive power to license, regulate, control, or to suppress or prohibit, the sale of intoxicating liquors"). None of those authorities proves that the authority to regulate does not include the authority to prohibit.

like WCO 878. Context supports that understanding, insofar as two other provisions of SB 587 expressly contemplate the existence of local rules that "govern the retail sale of tobacco products and inhalant delivery systems." First, the legislature stated that its purpose in enacting the statute was to establish a statewide licensing scheme to "*improve enforcement of local ordinances and rules \* \* \* that govern the retail sale of tobacco products and inhalant delivery systems.*" ORS 431A.192 (emphasis added). The legislature used identical wording in ORS 431A.202(1)(b), which authorizes the DOR to revoke, suspend, or refuse to issue or renew a license if a licensee "[v]iolates an ordinance enacted by the governing body of a local public health authority or a rule adopted by a local public health authority *that governs the retail sale of tobacco products or inhalant delivery systems.*" (Emphasis added.) Like ORS 431A.218(2)(a), ORS 431A.192 and ORS 431A.202(1)(b) thus contemplate that local governments have broad authority to adopt rules governing the retail sale of tobacco products. They do not suggest a legislative intent to limit local ordinances to those that regulate "how or the manner in which" tobacco sales are made or to preclude ordinances that govern the retail sale of tobacco products by banning the sale of certain of those products.

Finally, the retailers argue that legislative history supports their interpretation. They point to two statements taken from legislative hearings on SB 587, one expressing the witness's "concern" that the legislature would adopt a "patchwork approach" to licensing rather than a "coordinated statewide approach,"[9] and another by a sponsor of SB 587, Senator Steiner Hayward:

> "I would note also that a lot of the major retailers who have outlets across the state are very supportive of this bill because there's starting to be a patchwork of licensure regulation in different counties around the state and they are eager to have a single system that they can use as the baseline and they don't have to have different rules for different stores in different counties."

---

[9] Testimony, Senate Committee on Health Care, SB 587, Mar 1, 2021 (statement of Shawn Miller, Northwest Grocery Association).

Video Recording, Joint Committee on Ways and Means, SB 587, June 16, 2021, at 1:43:31 (comments of Sen Steiner Hayward), https://olis.oregonlegislature.gov (accessed Apr 29, 2026). Taking those statements at face value, they show, at best, that the legislature intended SB 587 to impose a single system for "licensure" (with exceptions for preexisting local licensing requirements)—meaning a single set of requirements *for obtaining a license*—but they do not show that the legislature intended to preclude local governments from adopting public health and safety ordinances that ban certain tobacco products that the local government views as unhealthy or unsafe for its citizens.

Moreover, even if we were to agree with the retailers that those two statements might reflect a possible legislative intention to preclude local ordinances like WCO 878, that would not be sufficient for us to conclude that SB 587 preempts WCO 878. Again, in determining whether a local ordinance is preempted by a state statute, we look for *unambiguously* expressed intentions of the legislature. *Gunderson*, 352 Or at 663. In light of that standard, we are mindful that, in some endeavors of statutory interpretation, this court is "not at liberty to give effect to any supposed intention or meaning in the legislature, unless the words to be imported into the statute are, in substance at least, contained in it." *Patton v. Target Corp.*, 349 Or 230, 243, 242 P3d 611 (2010) (quoting *Whipple v. Howser*, 291 Or 475, 480, 632 P2d 782 (1981)). Here, the words are not, in substance, contained in the statute, and, therefore, the statute does not unambiguously express the intention of the legislature to preempt local ordinances like WCO 878. To the contrary, as discussed, ORS 431A.218(2)(a) expressly contemplates that local governments may enact ordinances that regulate the retail sale of tobacco products for purposes related to public health and safety. WCO 878 is such an ordinance.

### III.   CONCLUSION

At bottom, all of the retailers' arguments rely on the premise that SB 587 expressly grants licensees permission to sell all types of tobacco products. They then argue that WCO 878, as a ban on the sale of flavored tobacco products, is a partial prohibition on engaging in the same conduct

permitted by the license, and, therefore, the laws conflict and cannot be simultaneously applied to a licensee. As we have explained, we disagree. Nothing in SB 587 unambiguously gives retailers permission to sell all types of tobacco products, and, therefore, SB 587 is not unambiguously incompatible with WCO 878. We also conclude that WCO 878 is a "standard for regulating the retail sale of tobacco products and inhalant delivery systems for purposes related to public health and safety" that was enacted by a local public health authority as permitted under ORS 431A.218(2)(a). For those reasons, we hold that the retailers have not met their burden to show that SB 587 preempts WCO 878.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.